### NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

### BAJA'S PLACE, Respondent.

### No. 83–5117.

United States Court of Appeals, Sixth Circuit.

Argued and Submitted March 13, 1984.

Decided May 3, 1984.

Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Helen L. Morgan, Mark S. McCarty, Washington, D.C., for petitioner.

Ellsworth K. Hanlon, Dearborn, Mich., for respondent.

Before KEITH and KRUPANSKY, Circuit Judges, and WEICK, Senior Circuit Judge.

PER CURIAM.

This case is before this court on the application for enforcement of an NLRB order issued against Baja's Place, Inc. on August 31, 1982. The order was predicated on the Board's findings that Baja's Place (Company) had violated § 8(a)(1), 29 U.S.C. § 158(a)(1), of the National Labor Relations Act (Act), by coercively interrogating employees about their union activities, by threatening to close the facility (a restaurant) if the employees unionized, and by creating the impression that the company had employee union activity under surveillance. The Board also concluded the Company violated § 8(a)(3) and (1) of the Act when it discharged employee Marilyn Drean (Drean) as a result of her union activities.

The Board's order required the company, which is now insolvent and inoperative, to cease and desist from unfair labor practices, and to reinstate Drean to her former or a comparable position, to compensate her for lost earnings, and to expunge any reference of the discharge from the Company's personnel records.

The factual record upon which the Board's conclusions are predicated center on several incidents which occurred within approximately a three week time frame during November and December of 1980. On November 22, 1980, owner John Baja (Baja) announced at an employee meeting "the retrenchment of certain promised benefits." At the meeting, Baja also disclosed that assistant manager Sue Zukovich, who had hired most of the employees, had been discharged. On November 25, 1980, Drean contacted Dennis Tap (Tap), a business representative for Local 24 of the Hotel, Motel, Restaurant Employees, Cooks & Bartenders Union, and told him that the company employees were desirous of knowing more about union representation. Drean testified that one of the major reasons for contacting the Union was that following Zukovich's discharge, Drean felt that the Union would provide more job security for those hired by Zukovich. There was also testimony by Robin Ross (Ross), a former

employee at Baja's, that there were several general discussions about unionizing during informal after hours socializing at a nearby establishment called Kernin's Steakhouse. Ross said she thought at least one of these discussions occurred prior to the November 25 meeting and that Drean was present, but the administrative law judge determined that Ross was too inconclusive on this point to substantiate that claim.

At approximately 2 p.m. on November 25, union representative Tap met with twelve or thirteen of Baja's employees at Drean's house. During this meeting Tap obtained approximately twelve union authorization cards, including one signed by Drean, and subsequently that evening, Drean solicited signatures from an additional nineteen employees.

The following day, November 26, 1980, the union filed a representation petition with the NLRB's regional office. Later that day Tap hand delivered to restaurant manager Jack Panzer (Panzer) a letter addressed to owner Baja wherein the union asserted majority status and demanded recognition. Baja testified that he obtained legal advice sometime between this date and December 3, and was advised not to discuss the union with any of his employees.

On December 3, 1980, Baja and Drean encountered one another at a local restaurant. The events of that date were greatly disputed at the hearing. The controversy focused on the conversation between the two. Drean testified that she had never seen Baja at that particular establishment prior to December 3; Baja contrarily stated that he habitually frequented the restaurant after work.

Substantively Drean testified that when the two noticed one another they initially exchanged pleasantries. According to Drean's version, Baja then insisted on knowing if Drean was aware of union activity among company employees. While denying any knowledge thereof, Drean also stated that she opined to Baja that the waitresses had become concerned about

their employment security following the discharge of Zukovich, who was widely perceived to have been an effective manager. Drean related that Baja then warned her that he would close the restaurant if the union was recognized.

Baja's hearing testimony contradicted Drean's particularly with respect to the alleged threat of closure. Baja stated that when he entered the local restaurant, an intoxicated Drean accosted him. Baja said that Drean called his manager Panzer "a jerk," opined that Zukovich should not have been discharged, said that she generally liked her job, and affirmatively stated, without any prompting from Baja, that she was not involved in the union drive.

The A.L.J. credited Drean's version of the events. First, the administrative law judge noted that, as to most other matters, Drean's testimony had been reliably corroborated. The A.L.J. then considered the substantive accounts and relative demeanor of Drean and Baja:

> Additionally, I find it improbable that Drean, who initiated and who largely organized employee support for the Union, would have on two occasions thereafter voluntarily and loudly proclaimed her loyalty to Respondent and her disconnection with the union effort, while she simultaneously criticized the management of the restaurant. I find it more probable that Baja, having recently been made aware of the union activities, seized the opportunity to interrogate an employee concerning the Union within the context of an ostensible, casual social encounter. His conduct, as testified to by Drean, is in accord and concurrent with the conduct of his subordinate chief cook, Brown, i.e., interrogation and threat. Finally, I found Drean's demeanor to have been more certain and to have possessed more of that quality of spontaneity characteristic of candor than the demeanor exhibited by Baja. Thus I conclude that John Baja did interrogate and threaten Drean on December 3, as testified to by Drean.

Waitress Robin Ross (Ross) testified that during the first week of December chief cook Craig Brown (Brown) initiated a conversation with her about the union. According to Ross, Brown asked her whether she knew anything about the union. Ross said she responded that she had little knowledge of the union, and that Brown then replied that he thought Baja would close the restaurant if the union organization was successful. Brown testified that he recalled the conversation, but that his only comment was his personal opinion that the restaurant could not stand the financial burden if the union was successful. Brown further testified that his only other conversations regarding unions involved encouraging employees to vote one way or the other. The A.L.J. credited Ross' account of the conversation, adding that even if Brown's statement to Ross was his own opinion, he did not clearly label it as such, and therefore, his statements could be construed as those of management. The A.L.J. further deemed Brown to have been a "supervisor" within the meaning of the Act.

Drean testified that around the same time as the Ross conversation, Brown accused Drean of being the union's "ringleader." Drean testified she denied his allegation, but when Brown persisted in asking what the employee complaints were, she listed job security and fringe benefits. According to her, Brown responded that Baja's Place would be forced to close if the union were successful. Brown could not recall this conversation. The A.L.J. concluded: "As his demeanor was uncertain and as he did not explicitly deny the aforesaid conversation with Drean, I credit her testimony."

The events reached a head on December 11 with an altercation between Drean and Baja. The facts surrounding the incident are again greatly disputed, and the testimony of the participants and witnesses provided little clarification as to what actually happened.

Drean testified that, at about 7:30 p.m. she and her neighbor, Debbie Celski (Cel-

ski), were together celebrating Celski's birthday. Drean stated that at about 10 p.m. they arrived at Baja's Place. When they arrived, they were seated at a table near the railing adjacent to the bar, and waitress Robin Ross accepted their order. However, Drean testified, Ross delivered a drink only for Celski. Ross advised Drean that she had been instructed by Baja not to serve Drean. Drean, Celski, and Ross testified that only at that point did Drean approach the bar where Baja was seated, and there ensued a profane, heated argument. According to Drean, Baja directed her to vacate the premises. Drean testified that she was shocked by the intensity of Baja's statements and returned to Celski's table. She said she attempted to sip from Celski's drink but that Baja removed the drink from her hand, and again ordered the two women to leave. Drean said she and Celski then left, unescorted.

Baja's narrative, which was supported by that of Brown and bartender Gary Wood (Wood), completely contradicted Drean's version. Baja stated that immediately after Celski and Drean were seated, Drean approached him while he was at the bar with Brown. Baja testified that Drean initiated a conversation on the same issues which had been raised during their December 3 confrontation. Neither Brown nor Wood testified as to the substance of the Baja-Drean conversation. However, they both testified that Drean appeared slightly intoxicated. Waitress Ross testified that she didn't understand why Baja had refused to serve Drean.

Baja testified that after Drean approached him, he lost his temper and told Drean to leave: "You're not having anything to drink here. You've had enough to drink. Just go someplace else, or go back to where you came from when you had your drinks." Baja stated that Drean had angered him with her comments and general conduct, and that his hostility was fueled when Drean refused to leave when requested. Baja said he asked Celski to remove Drean because she was an embarrassment to him, and said that he would pay for Celski's drink. Panzer testified that he

eventually escorted Drean out of the restaurant at Baja's insistence.

In sum, Drean, Celski, and Ross all testified that Drean did not engage in loud or abusive conduct. Baja, Wood, and Panzer testified to the contrary, that Drean was intoxicated and created a scene in the bar. After careful evaluation of the relevant testimonies, the A.L.J. decided to credit Drean, Celski, and Ross:

I conclude that Drean, Celski and Ross testified with greater consistency and certitude than did Baja, Wood, Brown and Panzer. Although Celski may have been subject to a possible bias as a personal friend of Drean, Ross was not shown to have manifested any bias or animosity toward the Respondent that would have seriously jeopardized her credibility. As a former employee, she had nothing to gain by her testimony except the alienation of her former employer and future job reference source although Brown, as a former supervisor, also appeared to have no direct immediate interest in this proceeding except to cultivate a potential job reference source. However, his testimony was too vague and generalized, and failed to corroborate Baja on critical details, e.g., the substance in whole or at least in part of the alleged conversation between Baja and Drean. Had Drean hectored and harangued Baja as he testified, I find it inconceivable that his companion at the bar, Brown, would not have heard and recalled at least part of it. I therefore credit Drean and discredit Baja's account of their conversation of that night. Wood was even more generalized in his testimony and failed to corroborate, if not contradict, testimony as to Drean's alleged conversations with customers. Both Wood and Brown manifested an uncertain demeanor in testimony. Panzer was inconsistent, confused, uncertain and vague. His testimony contradicts, and is inconsistent with, that of Baja.

I conclude that the events and sequence of events on December 11 occurred as testified to by the witnesses

for the General Counsel. However, I also conclude that Drean was not as sober as their testimony suggests. I credit Brown's testimony that Drean, who admitted to having a "buzz" on, did give the appearance of being somewhat affected by alcohol in that she slightly slurred her speech and spoke in a slightly altered tone of voice. However, I conclude that she did not behave in a grossly intoxicated manner nor was she unruly, nor did she interfere with the Respondent's customers, nor did she cause Respondent any embarrassment by her behavior. I find that any "scene" that was created was that attributed to Baja's heated reaction to Drean's failure to display alacrity in removing herself from the restaurant, e.g., his loud vulgarity, the grabbing of a drink from Drean's hand, the threat to employ physical force, etc.

The next day Baja discharged Drean. On December 16, 1980, the union filed charges of unfair labor practices against Baja's Place. Upon the foregoing evidence, the A.L.J. found that violations of the Act were manifested by coercive interrogation of the employees, threats of closure as retaliation for union representation, unlawful surveillance of union activity, and the discharge of Drean. The National Labor Relations Board (NLRB/Board) affirmed on August 31, 1982 and thereafter instituted this action to enforce the order.

The company substantively identifies three issues in this action. First, the Board's determination that chief cook Brown was a supervisor is alleged as error. Second, the Company asserts the Board erred in finding that the Company coercively interrogated, threatened and surveilled the employees with respect to their union activities. Finally, the Company asserts as error the Board's determination that Drean was terminated as a result of her union activities.

The standard of review of Board factual findings is statutorily assigned. Federal courts are obligated to uphold the Board's decision if its findings are "supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e). *NLRB v. Wilson-Crissman Cadillac, Inc.,* 659 F.2d 728, 729 (6th Cir.1981).

█ Determining whether Brown should have been classified as a supervisor is critical to the issues of the coercive interrogation, the threats to close business, and the creation of the impression of surveillance. If Brown was indeed a supervisor, then his comments to Drean and Ross concerning the union activity were properly attributed to management. On the other hand, if Brown was merely an employee, his statements were expressions of personal opinions and not, under the circumstances, properly imputed to management.

Section 2(11) of the Act, 29 U.S.C. § 152(11) defines "supervisor" in the following terms:

(11) The term "supervisor" means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

The section is to be read in the disjunctive; thus if a person meets any of the functions set forth in the statute, the employee would qualify as a supervisor. *NLRB v. Wilson-Crissman Cadillac, Inc.,* 659 F.2d 728, 729 (6th Cir.1981); *NLRB v. Roselon Southern, Inc.,* 382 F.2d 245, 247 (6th Cir.1967).

The A.L.J.'s determination that Brown was a supervisor was based for the most part on Brown's own testimony regarding his responsibility and authority at Baja's Place. Brown testified that, in addition to ordering supplies and running the kitchen in a routine manner, he was also responsible for hiring dishwashers and other kitchen help, and that while Baja had the final say as to who was hired, Baja always

accepted Brown's recommendations. Two dishwashers testified that Brown had hired them, told them when to report to work, and generally supervised their activities. Brown therefore met the "to hire" criteria established by the Act for determining supervisory status and the A.L.J.'s decision that Brown was a supervisor is supported by substantial evidence and may not be disturbed by this tribunal.

Upon the findings of fact above described, the A.L.J. determined that owner Baja violated § 8(a)(1)[1] of the Act, 29 U.S.C. § 158(a)(1), by coercively interrogating Drean and threatening to close the business if the restaurant unionized. The violation occurred during Baja's meeting with Drean on December 3. The A.L.J. further imputed to management the comments made by supervisor Brown to Ross that the restaurant might close if unionized and Brown's later statement to Drean that he had heard she was the "ringleader" of the union activities.

The A.L.J.'s determination as to the true content of each of these conversations is based on his assessment of the relative credibility of the witnesses. In each instance, the conversation involved one representative of management and one employee, with no additional witness available to verify or refute the disparate accounts of each confrontation.

■ It is a well-established rule that it is the Board's function to resolve questions of fact and credibility when there is a conflict in the testimony. *NLRB v. Rawac Plating Co.,* 422 F.2d 1259, 1260 (6th Cir.1970). Consequently, this court "will not normally disturb the credibility assessments of the Board or Administrative Law Judge, who has observed the demeanor of the witnesses." *NLRB v. Cement Transport, Inc.,* 490 F.2d 1024, 1029 n. 5 (6th Cir.), *cert. denied,* 419 U.S. 828, 95 S.Ct. 47, 42 L.Ed.2d 52 (1974). *See also NLRB v. Mag-*

*netics International, Inc.,* 699 F.2d 806, 813 (6th Cir.1983).

■ The A.L.J. in the instant case commented at length about the general credibility of each witness and gave succinct reasons for his determinations of relative validity of each witness' testimony. Therefore, the Board's findings as to these violations are supported by substantial evidence and must be upheld. *NLRB v. Brown,* 546 F.2d 690 (6th Cir.1976). *See also, e.g., Charge Card Ass'n v. NLRB,* 653 F.2d 272 (6th Cir.1981); *NLRB v. Naum Bros., Inc.,* 637 F.2d 589 (6th Cir.1981); *Larand Leisurelies v. NLRB,* 523 F.2d 814 (6th Cir. 1975).

■ Finally, respecting the discharge of Drean, it is well settled that an employer may not be motivated by anti-union animus in the discharge of an employee. 29 U.S.C. § 158(a)(3). *See, e.g., NLRB v. Magnetics International, Inc.,* 699 F.2d 806 (6th Cir. 1983); *NLRB v. Bangor Plastics, Inc.,* 392 F.2d 772 (6th Cir.1967). In this case, the company asserted that Drean was discharged for legitimate reasons. Faced with this claim, the General Counsel had the burden to "make a prima facie showing sufficient to support the inference that protected conduct was a 'motivating factor' in the employer's decision." *Borel Restaurant Corp. v. NLRB,* 676 F.2d 190, 193 (6th Cir.1982). Once established, the employer had to rebut the prima facie case by showing that discharge would have occurred absent the protected activity. *NLRB v. Transportation Management Corp.,* 462 U.S. 393, 103 S.Ct. 2469, 76 L.Ed.2d 667 (6–15–83), *approving Wright Line, A Division of Wright Line, Inc.,* 251 N.L.R.B. 1083 (1980), *enf'd,* 662 F.2d 899 (1st Cir. 1981), *cert. denied,* 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982).

Instantly, the Company urged before the Board that Drean was discharged for her unruly conduct on December 11 and an

---

**1.** The relevant section of the Act, in 29 U.S.C. § 158, reads as follows:

§ 158. **Unfair labor practices**
(a) It shall be an unfair labor practice for an employer—

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

earlier incident, on November 24, wherein an off-duty Drean engaged in a loud argument with the Company's customer. Respecting these matters, the A.L.J. held that the proferred justification was pretextual. Because Drean had never been reprimanded for her November 24 conduct, the A.L.J. concluded that she was, in fact, discharged for her conduct during the week of December 3–11. Because the A.L.J. credited Drean's versions of the events of that time period, it was found that the Company discharged her in retaliation for the unionization efforts. Inasmuch as the Board's credibility and factual findings are supported by substantial evidence in the record considered in its entirety, they must be upheld on this appeal.

Consistent with the foregoing, the petition for enforcement of the Board's order is hereby granted.