925 F.2d 1464
 136 L.R.R.M. (BNA) 2543
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
OVERNITE TRANSPORTATION COMPANY, Respondent.
 No. 90-5535.
 United States Court of Appeals, Sixth Circuit.
 Feb. 11, 1991.
 
 Before KEITH and MILBURN, Circuit Judges, and CONTIE, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Petitioner NLRB seeks enforcement of its order that respondent Overnite Transportation Company ("Overnite") remedy unfair labor practices taken in violation of Secs. 8(a)(1), (3), and (4) of the National Labor Relations Act (the "Act"), 29 U.S.C. Secs. 158(a)(1), (3), and (4) (as amended). In the proceedings below, a three-member panel of the National Labor Relations Board affirmed, with only minor changes,[1] the February 10, 1988, decision and order of an Administrative Law Judge ("ALJ"). For the reasons that follow, we grant the Board's petition for enforcement.
 
 I.
 A. Background
 
 2
 This case arises out of the October 27, 1987, discharge of Overnite truck driver Danny Stevens and threats made prior to his discharge. Stevens was one of three persons recruited by an affiliate of the Teamsters Union in early April 1987 to assist in a union organizing campaign at Overnite's terminal in Lexington, Kentucky. Overnite was opposed to the union, attributing its success over the years to the lack of "significant interference from organized labor unions." John Stone and David May, the other drivers recruited to assist in the organizing campaign, were discharged in April 1987.
 
 
 3
 In June of 1987 General Counsel for the NLRB filed a labor complaint alleging that the discharge of May and Stone was unlawfully motivated and that Overnite made certain unlawful statements to its employees--including some to Stevens. A hearing before an ALJ followed (the "May hearing"). At the May hearing Stevens testified to facts which tended to exonerate May and show that his discharge was unlawfully motivated; however, Stevens refused to testify concerning management's alleged request that he attend a union meeting as a spy for the company. Presumably, Stevens' reluctance to testify led to settlement of the May case.
 
 
 4
 The May hearing was held in September 1987, and, as the dates illustrate, Stevens was discharged shortly thereafter. After Stevens was discharged, his reluctance to testify disappeared, and the complaint which generated these proceedings was filed. In the proceedings below, Stevens testified not only of Overnite's attempt to persuade him to attend the union meetings and report back to the company, but also of threatening conversations which persuaded him to limit his testimony at the May hearing.
 
 
 5
 For instance, Stevens testified of approaching terminal manager Rick Bentley and inquiring whether there was to be retaliation against employees who testified at the May hearing. After answering Bentley's inquiry concerning the substance of his proposed testimony, Stevens testified that he was told, "Well, ... if you testify to this, ... you will be dismissed." Stevens also testified that shortly before he took the stand in the May hearing, while he and assistant terminal manager Rex Moonieham were standing close together in a hallway, Moonieham motioned Stevens into a nearby stairwell where he informed Stevens, "If you testify for the Union, ... [t]here won't be any way that Rick can keep your job."
 
 
 6
 Although Bentley and Moonieham both admitted that the alleged conversations took place, they denied making any threats. Bentley testified that he "told Danny that ... he would have to go in there and tell the truth." Moonieham characterized the stairwell conversation with Stevens as "general chit-chat."
 
 B. The Discharge
 
 7
 On October 27, 1987, at approximately 9:00 to 9:15 a.m., Stevens arrived at Kings Food Sales Company ("Kings") with a load of ice cream in a refrigerated truck. At the time of his arrival there were five or six trucks waiting ahead of him to be unloaded. Per an agreement between Overnite and Kings, Stevens could have circumvented the normal industry practice of being unloaded on a first-come, first-served basis; however, Stevens had not been informed of the agreement.
 
 
 8
 Stevens proceeded to Kings' receiving dock where he found the receiving employees busy with paper work. Stevens did not announce his identity as an Overnite driver, nor did he announce that he was loaded with ice cream. Stevens simply inquired whether it would be "a long time" before he was unloaded, and the receiving employee responded, "Probably." Using a telephone located on the receiving dock, Stevens telephoned Overnite's dispatcher, Charles Blankenship, and reported that it would be approximately two to four hours before he could unload since several trucks were ahead of him. Blankenship responded: "Well, it's a hot load of ice cream, perishable. We got to get it off.... [S]tay there, and if they haven't got you off by 12:00, call me."
 
 
 9
 According to Stevens' account of the events that followed, he spent a short time in the receiving area talking with other truck drivers, passed away a few minutes in his truck cabin until he was driven away by diesel fumes and vibration, and spent some time sitting on a pile of concrete blocks located approximately 200 feet to the rear of his trailer. At about 10:20 a.m., Stevens checked the fuel level and temperature of the refrigeration unit and then walked across the street to the "C & P Market" where he used the restroom and purchased a snack and a soda. Stevens testified that he was away from the truck for approximately twenty minutes.[2]
 
 
 10
 When Stevens returned to his truck at approximately 10:45 a.m., he encountered Frank Barber, Overnite's assistant terminal manager, and other Overnite employees who had cut the padlock off his trailer doors in preparation to back it into the unloading area for priority treatment. The record indicates that Stevens' telephone call to the dispatcher initiated a chain of telephone calls through the ranks of Overnite and resulted in the salesman responsible for the Kings' account contacting one of Kings' buyers who agreed to give priority to unloading the ice cream.
 
 
 11
 Although the reports of what transpired are not entirely consistent, the record indicates that more than one person searched for Stevens to alert him that he needed to back his truck to the unloading area. In this regard, the record indicates that the searchers could not have recognized Stevens if they had encountered him face-to-face since he had not previously identified himself as an Overnite driver and had no distinct uniform which would have identified him. Upon learning that Stevens could not be located, Overnite's Frank Barber proceeded to Kings prepared to "hot-wire" the truck and cut the padlock off the trailer doors to facilitate the priority unloading. As this was being done, Stevens returned and backed his truck and trailer to the dock.
 
 
 12
 Stevens was then taken to Rick Bentley's office at the Overnite terminal. According to Stevens, when he answered Bentley's questions by explaining that he "walked across the street to get a pop and a cake, Bentley responded: "Well, ... you wasn't even in the area.... We've talked to everybody there.... You didn't go in the Kings Food. Nobody there has seen you. We've talked to everybody." When Stevens offered to prove his version of the incident, Bentley responded, "No, it don't make any difference. I've fooled with you long enough.... You're fired." Stevens also testified that when he inquired of the dispatcher concerning the reason for his discharge, the dispatcher answered, "I can't see any, there must be something else. There must be something else to it."[3] Although Stevens returned to Kings later that day and persuaded the day shift receiving foreman to inform Bentley that Stevens was present at the Kings loading dock early that morning and that he (the foreman) had seen Stevens use the telephone, Bentley was unmoved and informed Stevens that he was "still fired."
 
 
 13
 Two reasons were given for Stevens' discharge. One was an impermissible absence from his load, and the other was knowingly giving false information to the dispatcher. Relevant to the latter ground is Frank Barber's testimony that his belief Stevens had lied about being on the Kings dock and using the telephone was not a factor in the discharge. Somewhat inconsistently, Barber admitted that he later checked to ascertain whether Stevens could have called from a telephone on the dock. As to the company's position that Stevens falsely reported he would be detained four hours, the record demonstrates that Stevens reported an estimated two-to-four-hour wait. The record also indicates that Stevens' estimate was reasonable based on the number of trucks ahead of him.
 
 
 14
 In regard to the alleged impermissible absence from the truck, Blankenship admitted that based on the conversation between him and Stevens, Stevens had no reason to suspect that his truck would be unloaded ahead of the others. The record also indicates that Stevens' "break," if it was as he described it, was in accord with a company policy encouraging drivers to take their lunch and coffee breaks during delays in unloading. There was also testimony indicating that drivers need not call in before taking a break. It was further established that the load was not damaged and that Kings was not alienated as a customer. Considerable evidence was admitted to show that in the past, Overnite had declined to discipline drivers whose wrongdoing was more grievous than Stevens, even to the point of causing a loss of customer accounts.
 
 
 15
 The ALJ, whose decision was essentially adopted by the Board, found Stevens to be a credible witness and rejected in large part the testimony offered by Overnite's supervisors. The ALJ concluded that Overnite made threats and followed through using this "incident as a pretext to rid itself of a responsible employee whose only 'indiscretions' consisted of his Union involvement and his willingness to do his duty as a witness."
 
 
 16
 The principal issue presented in this appeal is whether substantial evidence based on the record as a whole supports the Board's findings.
 
 II.
 
 17
 Despite Overnite's characterizations to the contrary, Overnite essentially attacks the ALJ's credibility and factual determinations. Overnite also argues that the ALJ failed to consider the legitimate business reasons given for Stevens' discharge as mandated by Wright Line, 251 NLRB 1083 (1980). See NLRB v. Transportation Management Corp., 462 U.S. 393 (1983) (approving Wright Line test).
 
 
 18
 Based on our thorough review of the record and the briefs and having had the benefit of oral arguments, we are not convinced that the ALJ's credibility determinations are "unreasonable" or contrary to "good sense." Krispy Kreme Doughnut Corp. v. NLRB, 732 F.2d 1288, 1293 (6th Cir.1984); Local Union No. 948, IBEW v. NLRB, 697 F.2d 113, 117 (6th Cir.1982). Thus, we will defer to the ALJ's resolution of the conflicting testimony as the Board did. NLRB v. Baja's Place, 733 F.2d 416, 421 (6th Cir.1984) (per curiam).
 
 
 19
 Overnite's argument fails to persuade us that the ALJ (and thus the Board) ignored Wright Line, as the ALJ specifically found that Overnite's asserted reasons for the discharge were pretextual. We find substantial evidence on the record considered as a whole to support the Board's findings, including the finding of pretext. See 29 U.S.C. Sec. 160(e); Republic Die and Tool Co. v. NLRB, 680 F.2d 463, 465 (6th Cir.1982).
 
 III.
 
 20
 Accordingly, we grant the NLRB's petition for enforcement of its order.
 
 
 
 [1]
 The Board found that the ALJ "incorrectly stated that the record did not support the Respondent's argument that a truck loaded with ice cream would customarily take priority over other trucks." Overnite Transp. Co., 297 NLRB No. 99, at 1 n. 1 (1990). The Board found that the ALJ's error was harmless and did not affect the ultimate outcome, "because, by the Respondent's own admission, employee Stevens was unaware of the arrangement." Id. The Board also made a minor stylistic change in the language of the recommended order
 
 
 [2]
 The record indicates that the load was safe for hours if not days
 
 
 [3]
 Dispatcher Blankenship acknowledged the conversation with Stevens with a slight twist on the content. According to Blankenship, he answered Stevens' inquiries by stating, "There's a good reason, some policy, something's been broken."