983 F.2d 1066
 143 L.R.R.M. (BNA) 2304
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
D.J. ELECTRICAL CONTRACTING, INC., Petitioner, Cross-Respondent,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent, Cross-Petitioner,
and
International Brotherhood of Electrical Workers Local Union
141, Intervenor.
 Nos. 91-5981, 91-6051.
 United States Court of Appeals, Sixth Circuit.
 Jan. 8, 1993.
 
 Before MILBURN and ALAN E. NORRIS, Circuit Judges, and RUBIN, District Judge.*
 PER CURIAM.
 
 
 1
 The Petitioner, D.J. Electrical Contracting, Inc., (DJEC) an electrical contracting firm based in Neffs, Ohio, appeals for review of a decision and order of the Respondent, the National Labor Relations Board (NLRB). The NLRB and the Intervenor, the International Brotherhood of Electrical Workers Local 141 (the Union), have cross-applied for enforcement of the order. 29 U.S.C. §§ 160(e), (f). For the reasons stated herein the decision of the NLRB is enforced.
 
 
 2
 * Factual Background
 
 
 3
 In order to understand the issues presented to the NLRB a detailed factual recitation is necessary. The facts recited herein are recounted from the comprehensive factual findings of the NLRB administrative law judge (ALJ), before whom evidence in this matter was taken. D.J. Electrical Contracting, Inc., Nos. 8-CA-21979, 8-CA-22158 at 2-27 (October 18, 1990) (Decision) (Jacobs, A.L.J.); Joint Appx. at 10-35.
 
 Pre-Election
 
 4
 In October, 1988, James Stubenrod, business manager for the Union, met with David Jingle, the president of DJEC, to propose establishing a union labor contract. Stubenrod asked Jingle to arrange a meeting with DJEC's employees so he could explain the Union and allow the employees to decide upon union representation. Jingle, upon discussing the matter with his employees and explaining that signing with the Union would mean a wage cut, decided against arranging the meeting.
 
 
 5
 One of the employees with whom Jingle spoke, Jay LaRoche, contacted Stubenrod to get more information. Through LaRoche, Stubenrod arranged to meet with other interested employees at the Union hall. On November 10, 1988, LaRoche and fellow employee John Blacker met with Union officials. Following this meeting, LaRoche and Blacker spoke in favor of the Union and distributed Union literature to other DJEC employees.
 
 
 6
 In late November, 1988, Jingle informed his employees that he was not going to sign with the Union. In early December, Jingle restated his decision to the employees, LaRoche, Blacker and Oscar Lunsford among them, adding that if the employees "wanted to quit and go cut their own deal with the Union, they could." Sometime later that December, Jingle asked newly hired employee Dana Bonar how he felt about the Union. Bonar responded that upon moving to the area he tried, unsuccessfully, to join the Union. Jingle replied that at one time he also considered joining but that the union did things to cause him to distrust it so he did not join. Jingle told Bonar that he was having union trouble at DJEC.
 
 
 7
 On February 23, 1989, LaRoche and another DJEC employee, Paul Kartman, attended a second meeting at the Union hall, primarily to discuss holding a representation election. A few days later the Union filed a petition with the NLRB to represent the DJEC employees. An election was scheduled for April 6, 1989.
 
 
 8
 In early March, at a jobsite in Wheeling Island, Jingle questioned Blacker about the Union and asked if he had signed a union card. Blacker did not respond. On the morning of March 24, 1989, Jingle telephoned Blacker and told him to hold off coming into work due to inclement weather. LaRoche was told by telephone to take the day off. Blacker and LaRoche worked on March 27 and 28. These were the last days LaRoche worked at DJEC. Blacker continued to work sporadically up until the election, after which he did not work at DJEC again.[1]
 
 
 9
 On April 3, 1989, Jingle spoke with each employee individually. Jingle gave Blacker some literature outlining his position and told Blacker that the current DJEC medical plan was superior to the Union's plan and that Blacker would probably not be working year-round with the Union. Additionally, Jingle stated that if the Union came in it would hand out only two journeyman cards. Blacker responded that all of the employees would be tested equally and that he had just as good a chance of getting a journeyman card as anybody else. Jingle also related how, over the years, he had treated Blacker better than other employees.
 
 
 10
 In speaking with Bonar, Jingle asked how Bonar felt about the Union, to which Bonar responded that he would have to do what was best for his family and did not see how he could turn down an opportunity to join the Union. Regarding the election, Jingle stated that he did not think it would be fair if Bonar's was the deciding vote because he had only been with DJEC for a short time. Jingle assured Bonar that he had a future with DJEC but that regardless of the election results Bonar would be laid off from work for a week. Jingle then told Bonar that he had no intention of signing a Union agreement. Jingle, while addressing Kartman, gave him a copy of the literature outlining Jingle's position and informed him that he was not going to go with the Union.
 
 
 11
 The following day Jingle called a meeting of all the employees, except LaRoche. Jingle told them that while "there was work out there" he was not going to pursue it "until after the union thing; after the election." Jingle stated that he did not know how many people he would have working at DJEC and that he "just wasn't signing nothing" until he saw "what was going to happen." Jingle reiterated his opinion that only two of the employees would earn journeyman cards and, moreover, that DJEC would be allowed to keep only one apprentice, the others would have to obtain work from the Union. Finally, Jingle stated that the employees would not be working year-round if they went with the Union.
 
 Post-Election
 
 12
 On the morning of April 6, 1989, the DJEC employees voted 5-2 for representation by the Union. LaRoche, Blacker, Bonar, Kartman and John Welshans cast the five votes in favor of the Union. After the election Jingle told Bonar and Welshans, upon their scheduled arrival for work at DJEC, "I don't have any work for you." Neither worked at DJEC again. Jingle assigned Kartman and Blacker to the Belot Concrete (BCI) job which began on that day.
 
 
 13
 Later, at the BCI jobsite, Jingle asked Blacker how he voted. When Blacker responded that he had voted "yes" Jingle informed Blacker that he wanted to know such information so he could decide which employees to retain. This was Blacker's last day of employment with DJEC. That evening, upon returning to DJEC, Jingle asked Kartman how he had voted. Kartman replied that he had voted "yes." Upon arriving for work the following morning Kartman found the DJEC gate was locked. Kartman called Jingle that evening and told Jingle that if he made up his mind about scheduling Kartman to work the following week he should call Kartman by the upcoming Sunday evening. Jingle did not call. Lunsford and another DJEC employee, Angelo "Doc" Graham, finished the BCI job.
 
 
 14
 On April 7, Jingle asked Welshans to come by his office at DJEC, explaining that he was uncertain how Welshans had voted and that he wanted to be fair to those employees who had voted against the Union by scheduling them for work. Welshans informed Jingle that he had voted for the Union. Later that April, Blacker met with Jingle to discuss the job situation. During this meeting Jingle accused Blacker of being a union spy. Jingle then stated that if Blacker would cross a picket line that he would have work for Blacker.
 
 
 15
 The Resignation Letters and Bargaining Requests
 
 
 16
 In early May, 1989, Welshans spoke with Jingle's secretary about how to obtain his accumulated vacation and pension money. Jingle later informed Welshans that he could send him a check for the vacation money but that the pension money would have to stay in a 401(k) account until Welshans resigned from employment with DJEC. Jingle told Welshans that a letter of resignation was necessary in order for the bank to begin the process of releasing the money. Jingle offered to have his secretary type a resignation letter for Welshans to come down and sign. When Welshans arrived he asked what date he should enter on the line Jingle's secretary had left blank to indicate the effective resignation date. Jingle suggested the last day Welshans worked. Welshans entered 4-6-89, signed the letter and dated it 5-4-89.
 
 
 17
 In late April LaRoche received a letter from the DJEC health plan provider informing him that, on the basis of information received from DJEC, his benefits would be terminated at the end of the month. Aware that he had accumulated pension money, LaRoche sent Jingle a letter of resignation dated May 8, 1989, seeking these funds.
 
 
 18
 In early June, 1989, Blacker asked Stubenrod to compose a letter to Jingle requesting Blacker's pension money. This letter did not use the word "resignation" but unmistakenly conveyed the message that Blacker was entitled to the money because he was no longer employed with DJEC. A few days later Jingle called Blacker to inform him that he could not accept the letter as written. Jingle suggested that Blacker come down to DJEC and sign a letter prepared by Jingle's secretary. Upon arriving at DJEC Blacker refused to sign the letter because it stated, contrary to Blacker's understanding, that he had resigned from employment with DJEC.
 
 
 19
 The following week Jingle sent Kartman a letter of resignation for his signature, presumably for the purpose of Kartman obtaining his pension money. Rather than signing and returning the letter Kartman had the Union compose a letter to Jingle similar to the letter Stubenrod prepared for Blacker. Jingle responded by a letter dated July 18, 1989, which characterized Kartman's departure as a resignation. Kartman did not receive the pension money.
 
 
 20
 In early August, 1989, the parties entered bargaining negotiations. On September 15, 1989, Randall Vehar, counsel for the Union, wrote to DJEC's counsel, Gerald Duff, requesting: 1) annual reports and summary plan descriptions for DJEC fringe benefit plans; 2) vacation trust, work rule, and certain Bacon-Davis job documents; and 3) any documentation supporting Jingle's assertions that acceptance of the Union proposal would cost his customers hundreds of thousands of dollars and that DJEC lost money on certain jobs. Only the vacation trust documents were provided.
 
 
 21
 Upon conclusion of the next bargaining session, Vehar sent a letter dated October 3, 1989, requesting information about Ohio Valley Monitoring (OVM), a company owned and managed by Jingle. Vehar suspected Jingle of commingling DJEC and OVM work. Jingle refused this request on the ground that the companies were separate entities.
 
 II
 Procedural Background
 
 22
 The Union filed various unfair labor practice charges against DJEC. An NLRB administrative law judge (ALJ) found that DJEC had committed numerous unfair labor practices in violation of sections 8(a)(1), 8(a)(3) and 8(a)(5) of the National Labor Relations Act (NLRA or the Act), 29 U.S.C. §§ 158(a)(1), (3) and (5). Essentially, § 8(a)(1) prohibits an employer from interfering with its employees' right to organize and be represented by a union; § 8(a)(3) prohibits discrimination against employees as a result of their union membership or sympathies; and § 8(a)(5) requires that an employer bargain in good faith with its employees' representatives.
 
 
 23
 The ALJ concluded that DJEC, through Jingle, violated § 8(a)(1) of the Act by
 
 
 24
 [i]nterrogating an employee as to whether he had signed a union card, and several employees as to how they voted in the representation election; telling an employee that two other employees, who had been terminated because of their union activities, would not be working for the company even if the Union did not come in; telling employees that they would no longer work year-round if the Union obtained recognition; stating to an employee that if the Union got in, there would only be two journeyman cards handed out; telling an employee that the company had no intention of signing an agreement with the Union; threatening employees that if the Union won the election, the company would cut its work force, but if the Union lost the election, the company would keep its work force or expand it; threatening employees with termination if the Union were to win the election; threatening employees by telling them that those who voted "no" in the election would be retained as employees and those who voted "yes" in the election would be terminated; telling an employee that he was not allowed to work for the company because he was union and that the Union would not allow him to work for the company; telling an employee that his continued employment depended on his willingness to forgo union activities and membership; creating the impression of surveillance by telling an employee as to whether he would cross a picket line; and attempting to compel and compelling employees to execute letters of resignation for reasons violative of the Act.
 
 
 25
 D.J. Electrical Contracting, Inc., Nos. 8-CA-21979, 8-CA-22158 at 28 (October 18, 1990) (Decision); Joint Appx. at 36. Additionally, the ALJ found that DJEC violated § 8(a)(1) and § 8(a)(3) by discriminatorily "terminating Jay LaRoche, Dana Brent Bonar, John Welshans, Jr., John E. Blacker and Paul Kartman and by denying Blacker steady employment during the last several days preceding his termination, all because of union activities of these employees." Id. Finally, the ALJ concluded that DJEC violated § 8(a)(5) and § 8(a)(1) by refusing "to furnish the Union with information concerning the present and immediate past terms and conditions of employment of [DJEC] employees ... which information is necessary for, and relevant to, the Union's performance of its function as the exclusive collective-bargaining representative...." D.J. Electrical Contracting, Inc., Nos. 8-CA-21979, 8-CA-22158 at 29 (October 18, 1990) (Decision) (alteration added); Joint Appx. at 37.
 
 
 26
 The ALJ "[h]aving found that [DJEC] ... engaged in certain unfair labor practices [recommended that DJEC] be ordered to cease and desist[2] and take certain affirmative action designed to effectuate the policies of the Act." Id. (alterations and footnote added). The ALJ recommended and ordered that LaRoche, Bonar, Welshans, Blacker, and Kartman be offered immediate and full reinstatement, be made whole for lost earnings, and that DJEC furnish the information the Union requested in its letters of September 15, and October 3, 1989. Id. The NLRB affirmed and adopted the ALJ's recommendations in nearly all respects. D.J. Electrical Contracting, Inc., 303 N.L.R.B. No. 126 (July 22, 1991) (Decision and Order); Joint Appx. at 4.
 
 III
 Substantial Evidence
 Unfair Labor Practices
 
 27
 The standard of review is well established. We may not disturb the findings of the NLRB "where there is substantial evidence on the record considered as a whole to support the Board's findings." Litton Microwave Cooking Products v. N.L.R.B., 868 F.2d 854, 857 (6th Cir.1989); Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1951). In reviewing the evidence supporting an NLRB decision we " 'must take into account whatever in the record fairly detracts' from the weight of the evidence." Litton Microwave, 868 F.2d at 857 (quoting Universal Camera, 340 U.S. at 488). "The significance, on review, of an administrative law judge's decision largely depends on the importance of witness credibility in the particular case and we will not normally disturb the credibility assessments of the Board or an administrative law judge, 'who has observed the demeanor of the witnesses.' " Litton Microwave, 868 F.2d at 857 (citation omitted) (quoting N.L.R.B. v. Baja's Place, 733 F.2d 416, 421 (6th Cir.1984)).
 
 
 28
 Upon consideration of the record before this Court we conclude that the ALJ's factual findings of numerous unfair labor practices, as adopted by the NLRB, are supported by substantial evidence. In particular, contrary to DJEC's main arguments before this Court, substantial evidence supports the ALJ's factual finding that Welshans, LaRoche, Blacker and Kartman were discriminatorily terminated from employment with DJEC prior to signing the resignation letters. Substantial evidence also supports the conclusion that the employees submitted the letters in order to obtain their pension money, and that Jingle orchestrated the production of the letters in an attempt to obfuscate the discriminatory employment terminations by characterizing them as resignations.
 
 Extension of the Union Certification
 
 29
 The NLRB found that DJEC failed "to provide the Union with the information it requested [in the letters dated September 15, and October 3, 1989] just 1 month into the collective-bargaining process." Therefore, upon concluding that "the bargaining process never had a chance to get seriously and fairly underway," the NLRB modified the ALJ's recommended Order by extending "the certification year for a 1-year period running from the date that [DJEC] begins to bargain in good faith." D.J. Electrical Contracting, Inc., 303 N.L.R.B. No. 126 at 2 n. 2 (July 22, 1991) (Decision and Order); Joint Appx. at 5 (alterations added). DJEC argues that the NLRB's order extending the Union's certification constitutes an abuse of discretion as it is an inappropriate remedy under the circumstances.
 
 
 30
 The NLRB's remedial authority is " 'a broad discretionary one, subject to limited judicial review.' " Colfor Inc., v. N.L.R.B., 838 F.2d 164, 167 (6th Cir.1988) (quoting Fiberboard Paper Products Corp. v. N.L.R.B., 379 U.S. 203, 216 (1964)). This Court "may only disturb the Board's order if it constitutes an abuse of discretion." Colfor, 838 F.2d at 168.
 
 
 31
 Upon consideration of the facts as determined by the ALJ and supported by substantial evidence in the record, we conclude that the NLRB's order extending the Union's certification does not constitute an abuse of discretion. The one year extension is clearly within the NLRB's discretionary authority and is an appropriate remedy under the circumstances. The one year, coupled with the NLRB's order directing DJEC to furnish the information requested by the Union, will provide an opportunity for the parties to pursue meaningful collective bargaining.
 
 IV
 
 32
 Requests for Awards Under Rule 38, Motion for Leave to
 
 Supplement the Joint Appendix
 
 33
 Finally, we consider the requests of the NLRB and the Union for awards pursuant to Federal Rule of Appellate Procedure 38. Rule 38 provides that "[i]f a court of appeals shall determine that an appeal is frivolous, it may award just damages and single or double costs to the appellee." In assessing such a request "it is generally recognized that an appeal is frivolous 'if it is obviously without merit and is prosecuted for delay, harassment, or other improper purposes.' " N.L.R.B. v. Cincinnati Bronze, Inc., 829 F.2d 585 (6th Cir.1987) (quoting Dallo v. INS, 765 F.2d 581, 589 (6th Cir.1985)).
 
 
 34
 The NLRB argues that DJEC's non-challenge to certain § 8(a)(1) violations found by the ALJ and its assertion of meritless defenses warrant an award under Rule 38. The Union, in a motion filed separately from its brief, relies on the arguments taken by the NLRB. Additionally, the Union argues that DJEC's assertions concerning the non-remedial character of a resignation situation, the employment status of the five DJEC employees after December 19, 1989, and that all five employees submitted resignations are not supportable by law or the record. Furthermore, contrary to DJEC's implication, the Union contends that it was not a party to a previous proceeding in the District Court regarding this matter in which the NLRB sought temporary reinstatement of the five employees under § 10(j) of the NLRA. Moreover, the Union argues that the District Court did not, in ruling on the § 10(j) petition, make a factual finding that the five employees had resigned. (Union's Motion for Damages and or Costs at 1-5); N.L.R.B. v. D.J. Electrical Contracting, Inc., No. 89-883 (S.D.Ohio May 15, 1990) (Holschuh, C.J.) (order granting in part and denying in part injunctive relief); 29 U.S.C. § 160(j).
 
 
 35
 Responding specifically to the Union's motion, DJEC argues it to be "simply a new brief that is not provided for in the Rules. It re-argues the case. It should be therefore stricken." (DJEC's Motion and Memorandum Contra Motion and Request for Damages and Costs by Intervenor Union at 2). Additionally, without supporting authority, DJEC argues that the Union, as an intervenor, "should have no rights under App.Rule 38." Id. at 3. DJEC's arguments are not persuasive. Rather than comprising another brief we determine the Union's pleading to be a motion which comports with Federal Rule of Appellate Procedure 27(a). Moreover, under Rule 38 an intervenor may receive an award. N.L.R.B. v. Limestone Apparel Corp., 705 F.2d 799 (6th Cir.1982).
 
 
 36
 In response to both the NLRB and the Union, DJEC counters that its appeal is well founded because it reasonably could succeed. In support, DJEC strenuously emphasizes its prior "success," arguing that District Court previously ruled in its favor that the five employees resigned, and were not discriminatorily discharged, when that court declined temporary reinstatement of the employees as petitioned by the NLRB under § 10(j) of the NLRA. N.L.R.B. v. D.J. Electrical Contracting, Inc., No. 89-883 (S.D.Ohio May 15, 1990) (Holschuh, C.J.) (order granting in part and denying in part injunctive relief); 29 U.S.C. § 160(j). DJEC misunderstands a district court's function in considering a § 10(j) petition and the District Court's order.
 
 
 37
 As the District Court correctly stated, consideration of a petition under § 10(j) is ancillary to an unfair labor practice proceeding pending before the NLRB. Section 10(j) is a means by which the NLRB may seek to preserve the status quo pending its final adjudication of the pending proceedings. A district court, in considering a § 10(j) petition, does not reach the merits of an alleged unfair labor practice but rather may grant relief pending a final disposition of the NLRB proceeding. In considering relief under § 10(j), a district court determines whether there is reasonable cause to believe that unfair labor practices have been committed and, if so, whether injunctive relief is "just and proper." The question of whether a violation of the NLRA has occurred is reserved exclusively for the NLRB, subject to appellate review. Fleischut v. Nixon Detroit Diesel, Inc., 859 F.2d 26, 28-29 (6th Cir.1988); N.L.R.B. v. D.J. Electrical Contracting, Inc., No. 89-883 at 4-6 (S.D.Ohio May 15, 1990), aff'd No. 90-3630 slip op. (6th Cir. Dec. 14, 1990) (per curiam).
 
 
 38
 The District Court, as this Court stated, "found reasonable cause to believe that [DJEC] engaged in unfair labor practices ... [but declined] to order ... temporary reinstatement to the five workers as part of the injunctive relief ... pending final resolution of the unfair labor practice charges ... before the National Labor Relations Board." N.L.R.B. v. D.J. Electrical Contracting, Inc., No. 90-3630 slip op. at 1 (6th Cir. Dec. 14, 1990) (per curiam) (order upholding District Court order denying temporary reinstatement) (alterations added). Far from determining on the merits whether the five employees resigned or were discriminatorily discharged, the District Court simply did not, on the basis of the facts before it and prior to a final determination by the NLRB, consider temporary reinstatement to be "just and proper" relief. Under the § 10(j) scheme the District Court, correctly, reserved the question of whether the five employees resigned or were discriminatorily discharged in violation of the NLRA for consideration by the NLRB, subject to appellate review before this Court.
 
 
 39
 DJEC's perceived "success" is illusionary and comprises yet another argument in a frivolous appeal devoid of merit and interposed for delay. We hereby assess double costs against DJEC. DJEC's motion for leave to file a supplement to the joint appendix is granted.
 
 CONCLUSION
 
 40
 DJEC's petition for review is denied and the NLRB's application for enforcement of its order is granted. Double Costs are assessed against DJEC. Itemized and verified bills for costs may be filed by the NLRB and the Union with the clerk of this court, with proof of service, within fourteen days from the date this opinion is filed. DJEC's motion for leave to file a supplement to the joint appendix is granted.
 
 
 
 *
 The Honorable Carl B. Rubin, United States District Judge for the Southern District of Ohio, sitting by designation
 
 
 [1]
 Sometime between LaRoche's last day and the scheduled April 6, union representation election DJEC employee John Welshans overheard a conversation between Jingle and another DJEC employee, Angelo "Doc" Graham. Welshans testified, before the ALJ, that during this conversation Jingle told Graham that neither Blacker nor LaRoche would be working for DJEC "even if the Union didn't come in."
 
 
 [2]
 The ALJ recommended and ordered that DJEC cease and desist from: threatening or terminating employees for or interrogating employees about their union activities; creating an impression of surveillance of employees' union activities; compelling employees, in violation of the NLRA, to execute letters of resignation; refusing to furnish the Union with information concerning terms and conditions of employment for employees the Union represents; or, in any other manner, from interfering, restraining, or coercing employees in the exercise of their rights as provided under § 7 of the NLRA. D.J. Electrical Contracting, Inc., Nos. 8-CA-21979, 8-CA-22158 at 30 (October 18, 1990) (Decision of ALJ); Joint Appx. at 38