25 F.3d 1049
 146 L.R.R.M. (BNA) 2448
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
LWD, INC., LWD, Sanitary Landfill, Inc., LWD Trucking, Inc.,
Respondent.
 No. 93-5145.
 United States Court of Appeals, Sixth Circuit.
 May 24, 1994.
 
 Before: JONES, SUHRHEINRICH and BATCHELDER, Circuit Judges.
 PER CURIAM.
 
 
 1
 This case is before the court on the application of the National Labor Relations Board (the "Board") to enforce an order it issued against LWD, Inc., LWD Sanitary Landfill, Inc., and LWD Trucking, Inc. ("the Company"), a single, integrated business enterprise that handles, stores, and disposes of waste material. The decision of the Administrative Law Judge ("ALJ"), adopted by the Board, found that the Company violated Sections 8(a)(1) and 8(a)(3) of the National Labor Relations Act (the "Act"). 29 U.S.C. Sec. 158(a)(1) and (3). Specifically, the Board found that the Company maintained an illegal rule prohibiting employees from discussing wages; that the Company, through management personnel, told an employee that he would be watched and terminated upon his first mistake and told another employee that his union organizing made him an unpopular topic among management; and that the company president told another that he held a grudge against the union, in violation of Section 8(a)(1). The Board ruled that the Company violated Sections 8(a)(1) and 8(a)(3) of the Act by issuing a disciplinary warning to employee David Downs on December 4, 1990, and laying off Downs and another employee on February 26, 1991, in retaliation for union activity. The Board ordered the Company to cease and desist from their unfair labor practices.
 
 
 2
 The Company argues that the Board's conclusion that it discriminated against David Downs, in selecting him for layoff because of his union activities, is unsupported by substantial evidence in the record as a whole and that the Board's order of reinstatement and backpay must be denied in light of Downs' attempt to fraudulently obtain unemployment benefits.[1] For the following reasons, we ENFORCE the Board's order.
 
 I.
 
 3
 The Company handles waste treatment and disposal at two facilities, one for the incineration of hazardous waste, the other a landfill for nonhazardous waste. At the incineration facility, the Company employs furnace operators which it classifies as "A," "B," or "C" according to their skill. These operators control the incinerators in the furnace department.
 
 
 4
 In September of 1989, the Kentucky Department of Natural Resources and Environmental Protection ("KDNR") notified the Company that it planned on denying the Company's operational permit for the incinerators. Amos Shelton, the owner and president of the Company, explored contingency plans while awaiting the final determination which arrived in September of 1990. The KDNR denied the operational permit; however, the Company successfully obtained a restraining order to enjoin the enforcement of the permit denial. Also, Shelton, in conjunction with Larry Howell, the general operations manager, and Danny Burnett, the production manager, assessed future manpower requirements to determine possible cutbacks in each department. They decided that three employees from the furnace department would be laid off, including one operator from each class and compiled supervisors' recommendations and ratings of employee performance in an effort to identify which employees to select. Among those recommended was David Downs, a leader in the movement to unionize, and the Company placed him on layoff on February 26, 1991.
 
 
 5
 The Administrative Law Judge ("ALJ") determined that the Company laid off Downs as a result of his union activity. The ALJ made the following fact findings in reaching his conclusion. On June 21, 1990, Downs and two coworkers attempted to clear a malfunctioning pump on a tank containing vinyl acetate. Some of the chemical spilled and the fumes overpowered the trio. They sought medical treatment and Downs was hospitalized for five days.
 
 
 6
 The District Lodge 154 of the International Association of Machinists and Aerospace Workers ("Union") used the accident to rally support for unionization and the day after the incident, a petition for Board election was filed. During the time between the filing of the petition and the election, the Company sent letters to all employees expressing the Company's position that a union would not be welcome. The election occurred August 10, 1990, with the majority of eligible employees voting against union representation.
 
 
 7
 The company doctor cleared Downs to return to work on August 13, 1990, but Downs had to meet with Shelton before resuming work. At their meeting, management officials, including Gautam Trivedi, the environmental health and safety manager, Howell and Gary Metcalf, the environmental coordinator, were present. Shelton indicated that he was concerned about Downs' "sensitivity" to chemical spills and when Downs protested that he had been cleared for work, Shelton told Downs that he was temporarily laid off.
 
 
 8
 After Downs reported this meeting to the Union, the union agent contacted Shelton who then told Downs that a mistake had been made and that Downs should report for work the following day. When Downs returned, however, he had been reassigned from Class A furnace operator to the labor gang. Again Downs reported this to the Union, and on August 24, 1990, a union agent contacted Shelton to discuss post-election conditions at the plant. The two struck an agreement and Shelton promised to return employees to their previous position provided the Union drop unfair labor practice charges leveled against the Company. Despite the agreement, Downs continued to work as a laborer.
 
 
 9
 On September 17, 1990, the shift leader of the labor gang told Downs that the operations manager, Howell, knew Downs was still talking union and Howell would not tolerate it. The next afternoon, the Company issued warnings to Downs and three coworkers for lack of efficiency and effort. Later, Downs discussed this warning with the union agent and inquired about his reinstatement as a Class A operator. The union agent contacted Shelton and threatened to refile charges if the Company did not uphold its promise.
 
 
 10
 In October, Shelton, Howell, Trivedi and Metcalf met with Downs. Shelton taped the meeting; however, this recodring was never produced and Shelton stated that it was destroyed after the meeting. According to Downs, Shelton stated he wanted to know about Downs' deal with the union agent. Shelton then reassigned Downs to his job as furnace operator but warned Downs that his first mistake would result in termination. Shelton admitted warning Downs that he would be watched but claimed it was because Downs was receiving breathing therapy and that Shelton was concerned about dizziness and potential danger to other workers. Trivedi did not recall Shelton asking about the union arrangement or commenting on any plan to watch Downs. Likewise, Metcalf recalled neither exchange. The ALJ credited Downs' testimony, noting that the Company did not produce the tape to support their testimony or specifically deny Downs' version of the meeting. The ALJ also noted Downs' denial that he received breathing therapy as further evidence that the Shelton's version was inaccurate.
 
 
 11
 Downs worked without incident until November 21, 1990. On that date, Downs disconnected an overheating furnace from one tank and connected it to a water tank. Because Downs never capped the disconnected hose, a spill occurred. Shelton fired Downs as a consequence but rescinded the termination after learning that the spill involved rainwater, not a hazardous material, and was not reportable. On December 4, 1990, Downs received a written warning about the spill. Downs testified that at this meeting Shelton stated that he held grudges against the Union. Again, the ALJ credited Downs' testimony.
 
 
 12
 In February 1991, the Company placed Downs on permanent layoff.
 
 II.
 
 13
 Section 7 of the Act guarantees employees "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection...." 29 U.S.C. Sec. 157. Section 8(a)(1) of the Act then makes it an unfair labor practice for an employer to interfere with an employees Section 7 rights. 29 U.S.C. Sec. 158(a)(1). Section 8(a)(3) of the Act makes it unfair for an employer to discourage membership in a labor organization through hiring or tenuring conduct. 29 U.S.C. Sec. 158(a)(3).
 
 
 14
 Factual issues decided by the Board will not be disturbed on appeal provided there is substantial evidence in the record, as a whole, to support those conclusions. Kux Mfg. Co. v. NLRB, 890 F.2d 804, 808 (6th Cir.1989). Evidence is substantial "if it is adequate, in a reasonable mind, to uphold the decision." Emery Realty, Inc. v. NLRB, 863 F.2d 1259, 1262 (6th Cir.1988) (quotation omitted). The Board's credibility determinations will not be disturbed unless they lack a rational basis. NLRB v. Baja's Place, 733 F.2d 416, 421 (6th Cir.1984).
 
 III.
 
 15
 The Company raises two claims in its appeal. The first is that there is no substantial evidence to support the conclusion that Downs' union activities resulted in his selection for layoff. The second is that Downs' reinstatement must be denied because of his conduct relating to unemployment benefits. A discussion of each issue follows.
 
 A. Retaliation Against Downs
 
 16
 The Board found that the Company discriminated against Downs because of his Union activity in selecting him for permanent layoff in violation of Section 8(a)(3) and (1). See NLRB v. Transportation Management Corp., 462 U.S. 393, 397 (1983). The Company asserts that Downs' layoff was motivated by legitimate financial considerations. As evidence that union activity was not a factor in deciding to lay off Downs, it named several union supporters that were not laid off and asserts that Shelton, the final decisionmaker as to which employees would be laid off, denies giving consideration as to whether an employee supported the union. The Company also contends that even absent union activity, Downs would have been selected for layoff because he was a problem employee. He had spilled hazardous materials and was physically vulnerable to the effects of hazardous materials normally handled by persons in his position.
 
 
 17
 The issue of motivation is "a question of fact." NLRB v. Murray-Ohio Mfg. Co., 358 F.2d 948, 950 (6th Cir.1966). In Transportation Management, the Supreme Court found that in determining motivation in an unlawful discrimination case, the General Counsel must show that the employer's opposition to protected activity was a "motivating factor" in the employer's decision to take adverse action against the employee. Transportation Management, 462 U.S. at 401. Once the prima facie case is established, the adverse action will be found unlawful unless the employer demonstrates, as an affirmative defense, that it would have taken the same action even in the absence of protected activity. Id. at 401-402.
 
 
 18
 Evidence of retaliation may be circumstantial, Birch Run Welding & Fabricating, Inc. v. NLRB, 761 F.2d 1175, 1179 (6th Cir.1985), inferred from such factors as the employer's knowledge of employee's protected activities, Turnbull Cone Baking Co. v. NLRB, 778 F.2d 292, 297 (6th Cir.1985), cert. denied, 476 U.S. 1159 (1986); employer's hostility toward protected activities, Grand Rapids Die Casing Corp. v. NLRB, 831 F.2d 112, 117 (6th Cir.1987); and the timing of the discharge. Birch Run, 761 F.2d at 1179.
 
 
 19
 The Board found that the General Counsel presented sufficient evidence to establish a prima facie case of discrimination. Evidence was presented to show that Downs was a leader of the Union's attempt to organize the plant. He distributed handbills and solicited signatures on authorization cards. He campaigned for the union on election day. Shelton conceded that he knew of Downs' role in the effort to bring in the union. The Company expressed anti-union sentiment in its employee handbook which indicated it would oppose any effort to organize the plant. The Company sent a letter to employees at the outset of organizing to convey its opposition to the union campaign. The ALJ found that these lawful expressions of opposition were followed by unlawful coercive conduct, much of which was directed at Downs.
 
 
 20
 Initially, we note that Downs was never disciplined prior to the union election. The first action directed at Downs was the Company's refusal to return him to the furnace department even after the company doctor had released him. The ALJ found that Shelton's explanation for this conduct was self-serving and not credible. We find no reason to substitute our judgment for the Board or the ALJ who observed the witnesses. See Baja's Place, 733 F.2d at 421. The credibility findings are consistent with a reasonable reading of the record. Although Shelton contended that additional allergy testing for Downs was needed before Downs had contact with chemicals, we find no evidence in the record that testing occurred. Further, the doctor made no such recommendation. Accordingly, we infer that it was reasonable for the ALJ to infer that the concern for Downs' safety was pretextual and it was the union agent's confrontation with Shelton and not a medical clearance that resulted in Downs' return to the furnace department.
 
 
 21
 Similarly, the November rainwater spill was used by the Company to justify its conduct toward Downs. Although Shelton testified that the Company had enacted a new policy regarding disciplinary action to be taken in the event of spills, the policy was never announced to employees. Further, Downs accepted responsibility for the spill immediately after it occurred, yet two weeks passed before any disciplinary action was taken. The failure to announce the policy and the passage of time provide ample support for the ALJ's conclusion that the reason Downs was disciplined was his union activity.
 
 
 22
 Finally, the Company's characterization of Downs as a poor worker is unsupported by his personnel file or specific instances in which he was reprimanded. The company production manager testified that Downs did not complete projects, however, he failed to recite specific instances to support his assessment. Although the Company relied on the July spill as evidence that Downs did not complete jobs properly, a contemporaneous report filed by Metcalf does not assign responsibility for the spill to Downs.
 
 
 23
 None of this evidence supports the Company's position that it had a legitimate reason for discharging Downs. Accordingly, we find that substantial evidence supports the ALJ's conclusion that the Company's discharge of Downs was motivated by union animus.
 
 B. Reinstatement
 
 24
 The Company also argues that the remedies ordered by the Board are inappropriate in light of intervening circumstances. It is undisputed that Downs collected unemployment insurance compensation while he worked for another employer. Nevertheless, the court may not consider an objection that has not been made to the Board absent extraordinary circumstances. 29 U.S.C. Sec. 160(e). The Company has not presented any extraordinary circumstances and, therefore, we grant enforcement of the Board's order without modification. The order is ENFORCED.
 
 
 
 [1]
 Although the Company frames the issue as whether the Board's findings and conclusions are supported by substantial evidence in the record as a whole, and attempts to include by reference the briefs it submitted to the NLRB, all argument on appeal is directed toward the circumstances involving Downs. We do not consider the NLRB briefs or their content because such a practice would nullify the page limitations established in Fed.R.App.P. 28(g). Because the Company has not addressed the finding that it violated Section 8(a)(1) of the Act, 29 U.S.C. Sec. 158(a)(1), by maintaining an illegal rule prohibiting its employees from discussing wages in the plant or the finding that supervisor Nathan Salyers stated to an employee that it would be difficult to recommend him for a raise in light of his union activities, we find no challenge has been made to these findings. Nor did the Company address the finding that it violated Section 8(a)(3) and (1) of the Act, 29 U.S.C. Sec. 158(a)(3) and (1), by permanently laying off Franklin Elkins, and again, we find no challenge has been made. See Hyatt Corp. v. NLRB, 939 F.2d 361, 368 (6th Cir.1991) (noting that a failure to address the Board's findings constitutes an abandonment of the right to object)