RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 17a0113p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

NATIONAL LABOR RELATIONS BOARD,

*Petitioner,*

*v.*

ALTERNATIVE ENTERTAINMENT, INC.,

*Respondent.*

No. 16-1385

---

On Application for Enforcement of a Final Decision
and Order of the National Labor Relations Board.
No. 07-CA-144404.

Argued:  November 30, 2016

Decided and Filed:  May 26, 2017

Before:  MOORE, SUTTON, and WHITE, Circuit Judges.

---

## COUNSEL

**ARGUED:**  Joel Heller, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Petitioner.  Timothy J. Ryan, JACKSON LEWIS P.C., Grand Rapids, Michigan, for Respondent. Harold Craig Becker, AFL-CIO, Washington, D.C., Evan M. Tager, MAYER BROWN LLP, Washington, D.C., for Amici Curiae.  **ON BRIEF:**  Linda Dreeben, Kira Dellinger Vol, Gregoire Sauter, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Petitioner. Timothy J. Ryan, JACKSON LEWIS P.C., Grand Rapids, Michigan, for Respondent.  Harold Craig Becker, AFL-CIO, Washington, D.C., Evan M. Tager, MAYER BROWN LLP, Washington, D.C., Michael Rubin, ALTSHULER BERZON LLP, San Francisco, California, for Amici Curiae.

    MOORE, J., delivered the opinion of the court in which WHITE, J., joined, and SUTTON, J., joined in part.  SUTTON, J. (pp. 24–34), delivered a separate opinion concurring in part and dissenting in part.

---

**OPINION**

---

KAREN NELSON MOORE, Circuit Judge.  Petitioner National Labor Relations Board (NLRB) seeks enforcement of a Decision and Order of the NLRB finding that Respondent Alternative Entertainment, Inc. (AEI) violated the National Labor Relations Act (NLRA).  AEI seeks relief from the order.  The NLRB argues that AEI violated the NLRA by barring employees from pursuing class-action litigation or collective arbitration of work-related claims.  The NLRB also contends that AEI violated the NLRA by forbidding James DeCommer, an AEI technician, from discussing a proposed compensation change with his coworkers and by firing DeCommer for discussing the proposed change and complaining to management about it.  For the reasons discussed below, we **ENFORCE** the NLRB's Decision and Order.

## I. BACKGROUND

DeCommer worked as a field technician for AEI from August 2006 until he was fired on December 18, 2014.  Administrative Record ("A.R.") (Hr'g Tr. at 13) (Page ID #19).  AEI provides Dish Network installation and services.  *Id.* at 87 (Page ID #93).

Two AEI employment documents are at issue in this case.  First, AEI requires its employees to sign an agreement entitled "AEI ALTERNATIVE ENTERTAINMENT, INC. OPEN DOOR POLICY AND ARBITRATION PROGRAM," which states that "Disputes between you and AEI (or any of its affiliates, officers, directors, managers or employees) relating to your employment with the Company" must, at the election of the employee or the company, be resolved "exclusively through binding arbitration."  A.R. ("Open Door Policy and Arbitration Program" at 1) (Page ID # 209).  The agreement also states that "By signing this policy, you and AEI also agree that a claim may not be arbitrated as a class action, also called 'representative' or 'collective' actions, and that a claim may not otherwise be consolidated or joined with the claims of others."  *Id.*  Second, AEI maintains an employee handbook, which lists "examples . . . intended to demonstrate the types of behaviors prohibited by the company."  A.R. (Employee Handbook at 27) (Page ID #196).  Examples include "[u]nauthorized disclosure of business

secrets or confidential business or customer information, including any compensation or employee salary information." *Id.* at 28 (Page ID #197).

The central dispute in this case stems from changes in field technicians' compensation. AEI compensates technicians using a "unit-based compensation system." A.R. (Hr'g Tr. at 17) (Page ID #23). AEI assigns each type of job a certain number of units. For example, "a trouble call or a service call . . . would be considered 12 units," and technicians receive compensation for each unit of work they perform. *Id.* Different technicians receive different per-unit compensation rates, ranging from approximately $1.90 per unit to approximately $4.00 per unit. *Id.* at 18 (Page ID #24). AEI determines each technician's per-unit compensation rate based on the technician's metrics, including factors like the number of jobs a technician completed, how frequently customers reported problems after a technician performed installations, and the technician's customer satisfaction ratings. *Id.*

While DeCommer was employed at AEI, the company made two changes to the compensation structure. First, AEI added smart home service sales[1] as a metric for all technicians. *Id.* Smart home sales were additional services, such as mounting a customer's television on the wall or selling accessories to complement a customer's home entertainment system, that technicians sold during service calls. *Id.* at 20 (Page ID #26). AEI began requiring technicians to meet a minimum dollar amount of smart home service sales in order to increase their pay per unit (initially the threshold was $6.00 per call and it later increased to $10.00 per call). *Id.*

At first, DeCommer excelled at smart home sales and in 2013 and 2014 he broke company records. *Id.* at 39, 48 (Page ID #45, 54). Later, he determined that he was losing money by spending time on smart home sales instead of going on more service calls, so his smart home sales numbers dropped off significantly. *Id.* at 40–41 (Page ID #46–47). There is some dispute about how DeCommer handled smart home sales after he stopped trying to break company records. DeCommer testified that he told his supervisor that he would continue to meet the minimum dollar amount in smart home sales but that he was no longer motivated to break

---

[1]These are also referred to in the record as "Smart Home Services."

records.  *Id.* at 40–41 (Page ID #46–47).  Specifically, he testified that he said, "I'll make sure I hit my goal.  I'm not going to miss that, but I'm not going to be pushed to be number one every month. . . . I actually lost money by doing that."  *Id.* at 40 (Page ID #46).  DeCommer's supervisor, Victor Humphrey, testified that on or around December 17, 2014 DeCommer told him he would not do smart home sales and that "he made the comment . . . that he talks his customers out of services."  *Id.* at 95–96 (Page ID #101–02).  Humphrey testified that after hearing this comment he was "in shock . . . [b]ecause I had an employee that just refused to do his job to his boss."  *Id.* at 96–97 (Page ID #102–03).  DeCommer, however, denied that he had a conversation with Humphrey on December 17, and also denied ever refusing to do Smart Home Sales.  *Id.* at 130 (Page ID #136).

The second change affected compensation only for technicians who, like DeCommer, drove their own vehicles.  A.R. (Hr'g Tr. at 14) (Page ID #20).  AEI employs field technicians who drive personally owned vehicles (POV technicians or POVs) and field technicians who drive company owned vehicles (COV technicians or COVs).  In November or December 2014, AEI announced it would begin compensating POVs for using their own vehicles based on mileage, not based on units.  A.R. (12/15/2014 Email from Neal Maccoux) (Page ID #306); A.R. (Hr'g Tr. at 43) (Page ID #49).  Under the old system, POVs received a supplement of $0.82 per unit to compensate them for the cost of driving their own vehicles.  A.R. (Hr'g Tr. at 26) (Page ID #32).  Under the new system,[2] POVs would be compensated $0.575 per mile[3] based on the miles driven from their first to their last job.  A.R. (12/15/2014 Email from Neal Maccoux) (Page ID #306); A.R. (Hr'g Tr. at 43) (Page ID #49).  DeCommer determined that he would "lose a lot of money" under this new system, estimating the change would cost him seven to ten thousand dollars per year, or about twenty percent of his total compensation.  A.R. (Hr'g Tr. at 25, 26, 31) (Page ID #31, 32, 37).

---

[2]DeCommer was fired before the new system took effect.  *See* A.R. (Hr'g Tr. at 119) (Page ID #125).

[3]There appears to be some confusion over whether the reimbursement rate would be $0.575 per mile or $0.52 per mile.  *See* A.R. (12/15/2014 Email from Neal Maccoux) (Page ID #300) (announcing a change to a $0.575 per mile reimbursement rate); A.R. (Decision & Order at 7) (Page ID #353) (discussing a change to a $0.52 per mile reimbursement rate).  This discrepancy does not impact our analysis, however.

DeCommer repeatedly voiced his concern about the proposed compensation change. DeCommer testified that he spoke with "probably 10 technicians or more" about the change and "[t]hey were concerned that they were going to lose money, that this pay was going to stop their proper compensation of driving their vehicle." *Id*. at 23 (Page ID #29). DeCommer testified that he had an in-person conversation about the proposed change with manager Rob Robinson. DeCommer testified that he "asked [Robinson] if he knew anything more about the pay change" to which "[Robinson] said, why don't we talk outside, because there were some other technicians in that general office area. . . . [I]t was at that point that Mr. Robinson told me that I don't want you talking to any of the other technicians about this; if you have any concerns or questions, I want you to direct them to myself or Mr. Humphrey." *Id.* at 28 (Page ID #34). DeCommer also testified that he discussed with other technicians the contents of the conversation with Robinson. *Id.* In addition, DeCommer sent a text message to Robinson and an email to the company president, Tom Burgess, criticizing the proposed change. A.R. (12/5/2014 Text Message) (Page ID #212); A.R. (12/16/2014 Email from James DeCommer) (Page ID #213). In the email to Burgess, DeCommer discussed the impact on his personal compensation and the compensation of other POVs. DeCommer repeatedly referred to the POVs collectively, saying that "[g]enerally speaking the povs are the highest p[er]formers and the most profitable of your tech force" and that the change would "unintentionally screw over almost [the] entire pov tech force." A.R. (12/16/2014 Email from James DeCommer) (Page ID #213). He says of the impact on POVs, "what you are asking myself and all the other povs to do is to accept a 20% pay cut." *Id.* (Page ID #214–15). DeCommer also included a discussion of the tax implications for POVs with different filing statuses. *Id.* (Page ID #214). Finally, Robinson set up a telephone conversation on or around December 16, 2014 between DeCommer and company CFO Neal Maccoux where DeCommer again expressed his concerns. A.R. (Hr'g Tr. at 30) (Page ID #36). In that conversation, DeCommer explained to Maccoux that he had "talked with other employees and that they had done their own figures and found that they would lose quite a bit of money as well if this change were to go through." *Id.* at 32 (Page ID #38). DeCommer testified that he informed other technicians—"anywhere from 5 to 10" of them, "[p]robably closer to 10"—about the discussion with Maccoux. *Id.* at 36 (Page ID #42).

AEI fired DeCommer on December 18, 2014. DeCommer testified that on December 18, General Manager Victor Humphrey said to DeCommer, "our relationship is not working out" and fired him. *Id.* at 38 (Page ID #44). DeCommer asked, "well, is it due to my job performance?" to which Humphrey responded, "no, our relationship is not working out." *Id.* Humphrey's testimony about their December 18 conversation mirrors DeCommer's, but Humphrey additionally testified that he made the decision to fire DeCommer the day before because DeCommer told Humphrey that he was not going to do smart home sales. *Id.* at 96–98 (Page ID #102–04). On the AEI Employee Separation Document, in response to "REASON FOR SEPARATION," Humphrey wrote, "Relationship is not working out." A.R. (AEI Employee Separation Document) (Page ID #224). In response to the question, "DID THEY WORK TO THE BEST OF THEIR ABILITY?" Humphrey wrote, "No, Did not work to his potential in Smart Home Services consistently." *Id.* In response to "OTHER COMMENTS" Humphrey wrote, "Consi[s]tently had a bad attitude." *Id.*

DeCommer filed charges and then amended charges against AEI with the NLRB. A.R. (First Amended Charge) (Page ID #147). The NLRB's General Counsel issued a complaint on March 26, 2015. A.R. (Compl. at 4) (Page ID #156). Administrative law judge (ALJ) Michael A. Rosas issued a recommended decision on July 9, 2015 finding that AEI violated the NLRA. A.R. (Decision & Order at 10–11) (Page ID #350–51); *Alt. Entm't, Inc.*, 363 N.L.R.B. 131, 2016 WL 737010, at *5 (Feb. 22, 2016). On February 22, 2016, the NLRB, by Chairman Pearce and Members Miscimarra and McFerran, adopted the ALJ's findings of fact and legal analysis and adopted with amendments the ALJ's conclusions of law. *Alt. Entm't, Inc.*, 2016 WL 737010, at *1. The amended conclusions of law stated:

> (1) By (1) prohibiting James DeCommer from discussing his concerns over changes in compensation with coworkers; (2) implementing rules prohibiting unauthorized disclosure of employee compensation and salary information; and (3) compelling employees, as a condition of employment, to sign arbitration agreements waiving their right to pursue class or collective actions in all forums, arbitral and judicial, the Respondent has violated Section 8(a)(1) of the Act. . . .
>
> (2) By discharging James DeCommer for engaging in protected activity, including discussing his concerns about salary, wages, or compensation structures with his coworkers and bringing complaints about those issues to management, the Respondent has violated Section 8(a)(1) of the Act.

*Id.* Member Miscimarra filed a separate opinion concurring in part and dissenting in part. *Id.* at *3. The NLRB filed an application for enforcement of the order on March 30, 2016.

We have jurisdiction to review the NLRB's Decision and Order pursuant to 29 U.S.C. § 160(e), (f). We "review[] the factual determinations made by the NLRB under the substantial evidence standard." *NLRB v. Local 334, Laborers Int'l Union*, 481 F.3d 875, 878–79 (6th Cir. 2007). "The deferential substantial evidence standard requires this court to uphold the NLRB's factual determinations if they are supported by 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* at 879 (quoting *NLRB v. Pentre Elec., Inc.*, 998 F.2d 363, 368 (6th Cir. 1993)). "When there is a conflict in the testimony, 'it is the Board's function to resolve questions of fact and credibility,' and thus this court ordinarily will not disturb credibility evaluations by an ALJ who observed the witnesses' demeanor." *Turnbull Cone Baking Co. v. NLRB*, 778 F.2d 292, 295 (6th Cir. 1985) (quoting *NLRB v. Baja's Place*, 733 F.2d 416, 421 (6th Cir. 1984)). We review the NLRB's application of the law to facts under the substantial evidence standard. *Id.* We review the NLRB's legal conclusions de novo; however, we defer to the NLRB's reasonable interpretation of the National Labor Relations Act. *Local 334*, 481 F.3d at 879; *Lechmere, Inc. v. NLRB*, 502 U.S. 527, 536 (1992) ("Like other administrative agencies, the NLRB is entitled to judicial deference when it interprets an ambiguous provision of a statute that it administers."); *NLRB v. United Food & Commercial Workers Union, Local 23*, 484 U.S. 112, 123 (1987) (applying *Chevron* deference to the NLRB's interpretation of the NLRA).

## II.  AEI'S BAR ON COLLECTIVE ARBITRATION OF WORK-RELATED CLAIMS

The NLRB concluded that AEI violated the NLRA by maintaining a company policy requiring employees to agree that disputes "relating to . . . employment with the company" must be resolved "exclusively through binding arbitration" and further agreeing that "a claim may not be arbitrated as a class action, also called 'representative' or 'collective' actions" or "otherwise be consolidated or joined with the claims of others." A.R. ("Open Door Policy and Arbitration Program" at 1) (Page ID #209). The NLRB concluded that AEI's arbitration provision violated the NLRA because it prevents employees from taking any concerted legal action. *Alt. Entm't, Inc.*, 2016 WL 737010, at *1, 5.

An arbitration provision that, like AEI's, prevents employees from taking any concerted legal action implicates two federal statutes, the Federal Arbitration Act and the National Labor Relations Act. The Federal Arbitration Act, 9 U.S.C. §§ 1 et seq., states that arbitration agreements are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA "manifest[s]" a "liberal federal policy favoring arbitration agreements." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 625 (1985). The FAA ensures that arbitration agreements are as enforceable as any other contract. *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006). The FAA does not, however, make arbitration agreements more enforceable than other contracts—"[a]s the 'saving clause' . . . indicates, the purpose of Congress . . . was to make arbitration agreements as enforceable as other contracts, but not more so." *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 n.12 (1967).

Section 7 of the National Labor Relations Act, 29 U.S.C. §§ 151 et seq., states that, "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection. . . ." 29 U.S.C. § 157. Section 8 states that, "It shall be an unfair labor practice for an employer . . . to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title." 29 U.S.C. § 158. "[C]ontracts . . . stipulat[ing] . . . the renunciation by the employees of rights guaranteed by the [NLRA]" are "a continuing means of thwarting the policy of the Act." *Nat'l Licorice Co. v. NLRB*, 309 U.S. 350, 361 (1940). Contractual provisions that "illegal[ly] restrain[]" employees' rights under the NLRA are unenforceable. *Id*. at 360, 365.

We must determine whether AEI's arbitration provision is enforceable under these federal statutes. Whether federal law permits employers to require individual arbitration of employees' employment-related claims is a question of first impression in this circuit; however, at least four other circuits have recently considered this question. *See Morris v. Ernst & Young, LLP*, 834 F.3d 975, 985–86 (9th Cir. 2016) (holding arbitration provisions mandating individual arbitration of employment-related claims violate the NLRA and fall within the FAA's saving

clause); *Lewis v. Epic Sys. Corp.*, 823 F.3d 1147, 1160 (7th Cir. 2016) (same); *Murphy Oil USA, Inc. v. NLRB*, 808 F.3d 1013, 1018 (5th Cir. 2015) (upholding its earlier holding in *D.R. Horton, Inc. v. NLRB*, 737 F.3d 344 (5th Cir. 2013), that arbitration provisions mandating individual arbitration of employment-related claims do not violate the NLRA and are enforceable under the FAA); *Cellular Sales of Mo., LLC v. NLRB*, 824 F.3d 772, 776 (8th Cir. 2016) (upholding its earlier holding in *Owen v. Bristol Care, Inc.*, 702 F.3d 1050 (8th Cir. 2013), that arbitration provisions mandating individual arbitration of employment-related claims do not violate the NLRA).[4] The California Supreme Court also recently considered this question. *See Iskanian v. CLS Transp. Los Angeles, LLC*, 327 P.3d 129, 141–43 (Cal. 2014) (holding that arbitration provisions banning class-action litigation or collective arbitration of employment-related claims are enforceable under the NLRA and the FAA's saving clause, but also holding that arbitration provisions banning representative claims under California's Private Attorneys General Act violates that Act). There were dissenting opinions in three of these cases. *See Morris*, 834 F.3d at 990 (Ikuta, J., dissenting); *D.R. Horton*, 737 F.3d at 364 (Graves, J., dissenting in part); *Iskanian*, 327 P.3d at 159 (Werdegar, J., dissenting in part). Although this question is one of first impression in this circuit, there is already a robust debate about the enforceability of arbitration provisions like the one at issue in this case.

AEI (and the Chamber of Commerce of the United States, arguing as amicus) urge us to follow the Fifth Circuit's reasoning in *D.R. Horton*, which held that a similar arbitration provision was enforceable. *See* 737 F.3d at 362. We determine that the Fifth Circuit reached the incorrect conclusion, and we decline to follow it.

The Fifth Circuit based its decision on two principles. First, it determined that the NLRA does not "override" the FAA. *Id.* at 360; *cf. CompuCredit Corp. v. Greenwood*, 565 U.S. 95, 98 (2012). But by asking at the outset whether "the policy behind the NLRA trumped the different policy considerations in the FAA that supported enforcement of arbitration agreements," *D.R. Horton*, 737 F.3d at 358, the Fifth Circuit started with the wrong question. Instead of beginning by asking which statute trumps the other, it makes more sense to start by asking

---

[4]On January 13, 2017, the Supreme Court granted writs of certiorari in *Morris*, *Lewis*, and *Murphy Oil* and consolidated the three cases. 137 S. Ct. 809 (2017) (granting certiorari and consolidating cases).

whether the statutes are compatible. "When addressing the interactions of federal statutes, courts are not supposed to go out *looking* for trouble." *Lewis*, 823 F.3d at 1158. Instead, "[b]efore we rush to decide whether one statute eclipses another, we must stop to see if the two statutes conflict at all." *Id.* at 1156 (citing *Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*, 515 U.S. 528, 533 (1995)); *see also Morton v. Mancari*, 417 U.S. 535, 551 (1974) ("The courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective.").

Starting with the right question reveals that there is no need to ask whether the NLRA trumps the FAA. The two statutes do not conflict. The NLRA and FAA are compatible because the FAA's saving clause addresses precisely the scenario before us. The NLRA prohibits the arbitration provision on grounds that would apply to any contractual provision, and thus triggers the FAA's saving clause. Because of the FAA's saving clause, the statutes work in harmony.

The core right that § 7 of the NLRA protects is the right "to engage in . . . concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157. Concerted activity includes "resort to administrative and judicial forums." *Eastex, Inc. v. NLRB*, 437 U.S. 556, 565–66 (1978); *see also NLRB v. City Disposal Sys., Inc.*, 465 U.S. 822, 835 (1984) ("[I]n enacting § 7 of the NLRA, Congress sought generally to equalize the bargaining power of the employee with that of his employer by allowing employees to band together . . . . There is no indication that Congress intended to limit this protection to situations in which . . . fellow employees combine with one another in any particular way."); *Brady v. Nat'l Football League*, 644 F.3d 661, 673 (8th Cir. 2011) ("[A] lawsuit filed in good faith by a group of employees to achieve more favorable terms or conditions of employment *is* 'concerted activity' under § 7 of the National Labor Relations Act."); *SolarCity Corp.*, 363 N.L.R.B. 83, 2015 WL 9315535, at *2 (Dec. 22, 2015) ("This protection has long been held to encompass the right of employees to join together to improve their terms and conditions of employment through litigation. Accordingly, an employer violates Section 8(a)(1) by compelling employees, as a condition of employment, to waive their right to 'collectively pursue litigation of employment

claims in *all* forums, arbitral and judicial.'") (quoting *D.R. Horton, Inc.*, 357 N.L.R.B. 2277, 2012 WL 36274, at *6 (Jan. 3, 2012)) (footnote omitted).

The NLRA prohibits mandatory arbitration provisions barring collective or class action suits because they interfere with employees' right to engage in concerted activity, not because they mandate arbitration. These are grounds that would apply to any contract. Because the NLRA makes such a contractual provision illegal on generally applicable grounds—interference with the right to concerted activity—the FAA does not require enforcement. According to the FAA's saving clause, because any contract that attempts to undermine employees' right to engage in concerted legal activity is unenforceable, an arbitration provision that attempts to eliminate employees' right to engage in concerted legal activity is unenforceable. Paying due respect to the text of the FAA, including its saving clause, makes clear that the NLRA and the FAA are compatible.

Second, the Fifth Circuit relied on its determination that "[t]he use of [Rule 23] class action procedures . . . is not a substantive right." *D.R. Horton*, 737 F.3d at 357. This determination is correct, but irrelevant. Rule 23 is not a substantive right, but the Section 7 right to act concertedly through Rule 23, arbitration, or other legal procedures is. The right to concerted activity is "a core substantive right protected by the NLRA and is the foundation on which the Act and Federal labor policy rest." *SolarCity Corp.*, 2015 WL 9315535, at *2; *see also NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 33 (1937) ("That [§ 7 right] is a fundamental right. Employees have as clear a right to organize and select their representatives for lawful purposes as the [employer] has to organize its business and select its own officers and agents."). The NLRB's position is not that there is a substantive right to utilize a particular procedure, such as Rule 23, or to bring a legal action in a particular forum; it is that "employers may not compel employees to waive their NLRA right to collectively pursue litigation of employment claims in *all* forums, arbitral and judicial." *D. R. Horton, Inc.*, 2012 WL 36274, at *16.[5] The NLRB has acknowledged that "arbitration must be treated as the equivalent of a

---

[5]Thus, we need not, and do not, decide what procedures for collective legal action may or may not be imposed via a mandatory arbitration provision.

judicial forum." *SolarCity Corp.*, 2015 WL 9315535, at *5 n.15 (citing *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20 (1991)).

The best indication that the right to concerted activity is a substantive right is the structure of the NLRA. *See Lewis*, 823 F.3d at 1160. In fact, "Section 7 is the NLRA's *only* substantive provision." *Id.* Section 7 establishes the right to concerted activity, and "[e]very other provision of the statute serves to enforce the rights Section 7 protects." *Id.* Section 8, for example, specifies that it is an unfair labor practice to interfere with § 7 rights. 29 U.S.C. § 158. Section 11 specifies the procedures the NLRB follows in investigating unfair labor practices, 29 U.S.C. § 161, and § 10 specifies the procedures the NLRA follows in preventing unfair labor practices, 29 U.S.C. § 160. Section 9 establishes procedures for collective bargaining and presenting grievances. 29 U.S.C. § 159. The structure of the NLRA, in which the other sections establish procedures for protecting the right established in § 7, does not make sense unless the right established in § 7 is a substantive right.

At the very least, the NLRB's determination that the right to concerted legal activity is substantive, *see SolarCity Corp.*, 2015 WL 9315535, at *2, is entitled to *Chevron* deference, *see Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984). "When a court reviews an agency's construction of the statute which it administers," the agency is entitled to deference unless Congress has unambiguously expressed its intent. *Chevron*, 467 U.S. at 842–43; *see generally* Cass R. Sunstein, Chevron *Step Zero*, 92 Va. L. Rev. 187, 208–09 (2006) (referring to threshold questions about judicial review of agency interpretation of statutes, such as whether the agency administers the statute, as *Chevron* Step Zero). Reviewing an agency's interpretation of a statute it administers, the court's first step is to determine whether Congress's intent is clear. *Chevron*, 467 U.S. at 842–43. At the second step, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843.

The NLRB administers the NLRA. *See* 29 U.S.C. §§ 153–155; *see also, e.g.*, *United Food & Commercial Workers Union*, 484 U.S. at 123 (applying *Chevron* deference to the NLRB's interpretation of the NLRA). Reaching the first step, Congress did not clearly express the intent to make the right to concerted activity procedural. If anything, by structuring the NLRA so that

all of the other sections implement procedures to enforce § 7, Congress clearly expressed the intent to make the right to concerted activity substantive; at most, because the text does not explicitly say whether the right is substantive or procedural, the NLRA is ambiguous as to whether the right to concerted activity is procedural or substantive. Reaching the second step, if the NLRA is ambiguous, then we must decide whether the NLRB's determination that the right to concerted activity is substantive "is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843. The Supreme Court has held that the right to concerted activity is "fundamental." *Jones & Laughlin Steel Corp.*, 301 U.S. at 33. The Court has also found that an employment contract that "discourage[s]," a discharged employee from challenging his discharge "through a labor organization or his chosen representatives, or in any way except personally," violates the NLRA. *Nat'l Licorice*, 309 U.S. at 360. In light of those holdings and the NLRA's structure, the NLRB's determination that § 7 creates substantive rights "is based on a permissible construction of" the NLRA. *Chevron*, 467 U.S. at 843.

Ultimately, we conclude that the NLRA is unambiguous and that the statute itself makes clear that the right to concerted activity is a substantive right. But if the NLRA is ambiguous about whether the right to concerted legal activity is a substantive right, at the very least the NLRB's determination that the right is substantive is a permissible construction of the NLRA entitled to *Chevron* deference. That the NLRB is not due *Chevron* deference as to interpretations of the FAA is irrelevant. Whether the right to engage in concerted action—and concerted legal action—is a substantive right is solely an interpretation of the NLRA. *Cf.* Note, *Deference and the Federal Arbitration Act: The NLRB's Determination of Substantive Statutory Rights*, 128 HARV. L. REV. 907, 919 (2015).

Therefore, we disagree with the Fifth Circuit's holding that employers may require employees to agree to a mandatory arbitration provision requiring individual arbitration of employment-related claims. Mandatory arbitration provisions that permit only individual arbitration of employment-related claims are illegal pursuant to the NLRA and unenforceable pursuant to the FAA's saving clause.

AEI and amicus also point to Supreme Court cases that they say control the outcome of this case, most importantly *American Express Co. v. Italian Colors Restaurant*, 133 S. Ct. 2304

(2013), *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011), and *Gilmer*. None of these cases, nor any other Supreme Court case, compels the conclusion that it is lawful to forbid employees from pursuing collective legal action regarding their employment-related claims.

*Concepcion* addresses "California's rule classifying most collective-arbitration waivers in consumer contracts as unconscionable." 563 U.S. at 340. This rule is called the *Discover Bank* rule because it derives from the California Supreme Court case *Discover Bank v. Superior Court*, 113 P.3d 1100 (Cal. 2005). In *Concepcion*, drawing on the general principle that state legislatures cannot pass laws that prohibit arbitration, the Supreme Court held that the FAA also prohibits state courts from applying generally applicable doctrines "in a fashion that disfavors arbitration." *Id.* at 341. The FAA prohibits such application because "a court may not rely on the uniqueness of an agreement to arbitrate as a basis for a state-law holding that enforcement would be unconscionable, for this would enable the court to effect what . . . the state legislature cannot." *Id.* (internal quotation marks omitted). As a result, the Supreme Court held, California's *Discover Bank* rule was preempted by the FAA because "[r]equiring the availability of classwide arbitration interferes with fundamental attributes of arbitration and thus creates a scheme inconsistent with the FAA," *id.* at 344, and "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *id.* at 352 (internal quotation marks omitted).

Despite *Concepcion*'s seemingly broad ruling, there are several factors that distinguish the arbitration provision at issue in *Concepcion* from the arbitration provision at issue in this case. First, *Concepcion* addresses a rule hostile to arbitration, and appropriately notes that the FAA was enacted specifically to address judicial hostility to arbitration. *Concepcion*, 563 U.S. at 339. By contrast, the NLRA is, if anything, in favor of arbitration. *See generally, e.g., United Steelworkers of Am. v. Cooper Tire & Rubber Co.*, 474 F.3d 271, 277–78 (6th Cir. 2007) (noting that national labor policy favors arbitration). For example, the NLRA explicitly allows for "voluntary arbitration to aid and encourage employers and the representatives of their employees to reach and maintain agreements concerning rates of pay, hours, and working conditions." 29 U.S.C. § 171(b). It also permits collective bargaining agreements that require arbitration of employees' individual claims. *14 Penn Plaza LLC v. Pyett*, 556 U.S. 247, 251–55, 258 (2009).

Second, *Concepcion* addresses consumer contracts. By contrast, this case is about labor law, and specifically the rights granted by the NLRA. Relevant to both of these distinctions is the crucial point that the NLRA does not seek to limit arbitration; instead, the NLRA seeks to allow workers to act in concert. *See City Disposal Sys.*, 465 U.S. at 835 ("[I]n enacting § 7 of the NLRA, Congress sought generally to equalize the bargaining power of the employee with that of his employer by allowing employees to band together in confronting an employer regarding the terms and conditions of their employment."). Any provision purporting to forbid employees from engaging in "concerted activities for the purpose of collective bargaining or other mutual aid or protection" runs afoul of the NLRA. 29 U.S.C. § 157. The problem with the AEI agreement is not that it mandates arbitration or that it prohibits collective arbitration; it is that it prohibits concerted legal action in *any* forum. The arbitration provision at issue in this case "would face the same NLRA troubles if [the employer] required its employees to use *only* courts, or *only* rolls of the dice or tarot cards, to resolve workplace disputes—so long as the exclusive forum provision is coupled with a restriction on concerted activity in that forum." *Morris*, 834 F.3d at 989. That is because "[t]he NLRA establishes a core right to concerted activity. Irrespective of the forum in which disputes are resolved, employees must be able to act in the forum *together*. . . . Arbitration, like any other forum for resolving disputes, cannot be structured so as to exclude all concerted employee legal claims." *Id.*

This case is also distinguishable from *Concepcion* because the *Discover Bank* rule is a judicially crafted state law, whereas the NLRA is a congressionally enacted statute. *Concepcion* indicates that one serious problem with the *Discover Bank* rule is that it presents "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Concepcion*, 563 U.S. at 352 (internal quotation marks omitted). *Concepcion* focuses on state courts' hostility to arbitration and their rules that thwarted the congressional intent embodied by the FAA. *Id.* at 341. The case before us involves the interaction of two federal statutes, both of which embody the "purposes and objectives of Congress." *Id.* at 352 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). We must employ the presumption that both federal statutes can be given effect. *Mancari*, 417 U.S. at 551. The NLRA and FAA can be given effect because, as discussed above, the FAA's saving clause provides a solution for precisely the issue before us.

Although *Concepcion* makes clear that it is "beyond dispute that the FAA was designed to promote arbitration" and embodies a "national policy favoring arbitration," *Concepcion* does not hold that the FAA requires enforcement of arbitration provisions in all circumstances. *Concepcion*, 563 U.S. at 345–46. The text of the FAA's saving clause precludes such a holding, because—as Congress established—an arbitration provision that runs afoul of any "grounds as exist at law or in equity for the revocation of any contract" is unenforceable. 9 U.S.C. § 2.

*Italian Colors* and *Gilmer* are similarly distinguishable from this case. In *Italian Colors*, merchants who accept American Express cards sued American Express for antitrust violations and "argue[d] that requiring them to litigate their claims individually—as they contracted to do—would contravene the policies of the antitrust laws." *Italian Colors*, 133 S. Ct. at 2309. The Supreme Court held that the arbitration provision was enforceable because "the antitrust laws do not guarantee an affordable procedural path to the vindication of every claim." *Id.* Because it addressed a contract between companies and an alleged tension between antitrust laws and the FAA, *Italian Colors* does not speak to the case before us, which is a labor-law case involving a substantive right, rather than a procedural vehicle to vindicate a right. Although there is no guarantee of an affordable procedural path to the vindication of antitrust claims, the NLRA is an explicit congressional guarantee of employees' right to engage in concerted activity, 29 U.S.C. § 157, including collective legal action, *Eastex*, 437 U.S. at 565–66; *Brady*, 644 F.3d at 673; *SolarCity Corp.*, 2015 WL 9315535, at *2.

Like *Italian Colors*, *Gilmer* also did not involve an arbitration provision purporting to undermine employees' statutory right to engage in collective action. Gilmer sued his employer under the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. § 621 *et seq.*, and argued that the compulsory arbitration provision in his securities registration application was invalid because "compulsory arbitration of ADEA claims pursuant to arbitration agreements would be inconsistent with the statutory framework and purposes of the ADEA." *Gilmer*, 500 U.S. at 27. The Court disagreed, and ultimately concluded that there was no inconsistency between mandatory arbitration and vindication of the plaintiff's rights under the ADEA. *Id.* Here, in contrast, there is a conflict between the NLRA's explicit guarantee of employees' right to concerted activity and an arbitration provision that explicitly prohibits any collective legal

action. Arbitration provisions that are illegal under the explicit and generally applicable terms of a federal statute are distinct from arbitration provisions that may be in tension with the underlying policy of a federal statute. Explicitly illegal arbitration provisions trigger the FAA's saving clause. "[A]rbitration agreements [are] as enforceable as other contracts, but not more so." *Prima Paint Corp.*, 388 U.S. at 404 n.12

Moreover, in both *Gilmer* and *Italian Colors*, the Court reiterated that, "By agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum." *Italian Colors*, 133 S. Ct. at 2314 (quoting *Mitsubishi Motors Corp.*, 473 U.S. at 628); *Gilmer*, 500 U.S. at 26 (quoting *Mitsubishi Motors Corp.*, 473 U.S. at 628). Because the arbitration provision at issue in this case prohibits AEI's employees from exercising the substantive statutory right to concerted action guaranteed by the NLRA, this case is distinct from *Gilmer* and *Italian Colors*, as well as *Concepcion* and *Mitsubishi Motors*.

Finally, even if the right to concerted legal action is procedural, rather than substantive, it is still a right guaranteed by § 7 of the NLRA. And under § 8 of the NLRA, "[i]t shall be an unfair labor practice for an employer . . . to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title [§ 7 of the NLRA]." 29 U.S.C. § 158. Thus, § 8 makes it illegal to force workers, as a condition of employment, to give up the right to concerted legal action, whether that right is substantive or procedural. *Nat'l Licorice Co.*, 309 U.S. at 355–61 (holding that requiring employees to sign individual contracts waiving their rights to self-organization and collective bargaining violates § 8 of the NLRA). An employer cannot avoid this core tenet of federal labor law simply by nesting a waiver of the right to collective legal action in an arbitration provision. *Id.* at 364 ("Obviously employers cannot set at naught the [NLRA] by inducing their workmen to agree not to demand performance of the duties which it imposes.").[6]

Therefore, we join the Seventh and Ninth Circuits in holding that an arbitration provision requiring employees covered by the NLRA individually to arbitrate all employment-related

---

[6]Additionally, neither the antitrust statutes at issue in *Italian Colors* nor the ADEA, at issue in *Gilmer*, contains a provision similar to § 8, further distinguishing those cases.

claims is not enforceable. Such a provision violates the NLRA's guarantee of the right to collective action and, because it violates the NLRA, falls within the FAA's saving clause.

## III. DECOMMER'S DISCUSSIONS WITH COWORKERS AND TERMINATION

The NLRB found that AEI forbade DeCommer from discussing compensation with the other POV technicians and fired him for doing so. Because these conclusions are supported by substantial evidence, we affirm.

"The deferential substantial evidence standard" that this court applies to ALJ and NLRB findings of fact means that these findings should be upheld "if they are supported by such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Local 334*, 481 F.3d at 878–79 (internal quotation marks omitted). "When there is a conflict in the testimony, 'it is the Board's function to resolve questions of fact and credibility,' and thus this court ordinarily will not disturb credibility evaluations by an ALJ who observed the witnesses' demeanor." *Turnbull Cone Baking*, 778 F.2d at 295 (quoting *Baja's Place*, 733 F.2d at 421).

The NLRB made a factual determination that AEI forbade DeCommer from discussing compensation with his coworkers. This finding was based in part on a credibility determination made by the ALJ. AEI argues that this court should not accept the ALJ's credibility determination because DeCommer testified that he was not sure that he was remembering the conversation with his supervisor correctly. AEI Br. at 40. DeCommer's testimony does not require us to overturn the ALJ's findings.

The testimony proceeded as follows:

Q. . . . How did that conversation start? Who called whom? Who talked to who? Was it in person?

A. If I remember right, Mr. Robinson was at the office that morning when I came in. There's the main office, and then there's two offices that are off the side of that, Mr. Humphrey's and then a spare office that's used for whatever, and Mr. Robinson was in the spare office. I came in and saw Mr. Robinson was there, went in and asked him if he knew anything more about the pay change or what was going on with that. And he said, why don't we talk outside, because there were some other technicians in that general office area. So he brought me outside, and it was at that point that Mr. Robinson told me that I don't want you talking to any of the other

technicians about this; if you have any concerns or questions, I want you to direct them to myself or Mr. Humphrey.

A.R. (Hr'g Tr. at 27–28) (Page ID #33–34).

While DeCommer's testimony indicates that he is uncertain about the details of where the conversation started, he does not indicate that he is uncertain about the content of the conversation. The ALJ's determination that DeCommer remembered, and testified credibly about, the content of the conversation is reasonable. Because the ALJ's credibility determination was reasonable, there is no basis for us to disturb it under the deferential standard of review we apply. Therefore, we affirm the NLRB's finding that AEI forbade DeCommer from discussing compensation with his fellow POV technicians.

Having adopted the ALJ's determination that AEI forbade DeCommer from discussing compensation with his coworkers, the NLRB concluded that AEI discharged DeCommer for having these discussions and bringing complaints regarding compensation to management. A.R. (Decision & Order at 2) (Page ID #348). AEI makes three arguments why this court should not affirm the NLRB's conclusion that DeCommer was fired for engaging in protected activity. We reject them all.

First, AEI asserts it did not violate the NLRA because DeCommer's actions were entirely self-interested, and not concerted activity at all. AEI relies primarily on *Manimark Corp. v. NLRB*, 7 F.3d 547 (6th Cir. 1993). In *Manimark*, the employee was summoned to a meeting about a change to the company's compensation policy that affected only him. *Id.* at 550. After "expressing a purely personal complaint" that the change was unfair, the employee "added as an afterthought that he and others had complained about" certain of their working conditions. *Id.* Then, despite being invited to "arrange for a group of employees to meet" with management, the employee "never told any of the other employees that he was going to, or had, made complaints to management on their behalf." *Id.* at 549–50. We concluded there was no evidence the employee "was acting in anyone's interest but his own," and thus the employee was not engaged in concerted activity. *Id.* at 551. AEI asserts that this case is like *Manimark*, because DeCommer's "only concern was for his own paycheck." AEI Br. at 34.

However, "[i]t is well settled that 'an individual employee may be engaged in concerted activity when he acts alone.'" *NLRB. v. Main St. Terrace Care Ctr.*, 218 F.3d 531, 539 (6th Cir. 2000) (quoting *City Disposal Sys.*, 465 U.S. at 831). And an individual who "bring[s] truly group complaints to the attention of management" on behalf of other employees is engaged in concerted activity. *Manimark*, 7 F.3d at 551 (quoting *Meyers Indus.*, 281 N.L.R.B. 882, 887 (1986)). Here, DeCommer discussed the compensation issue with other employees on several occasions, and also told other employees about his conversations with management. A.R. (Hr'g Tr. at 23, 28–29, 36) (Page ID #29, 34–35, 42). Although DeCommer unquestionably was concerned about his own compensation, he also repeatedly expressed concern about how the policy change would affect other POVs. *Id.* at 29, 37 (Page ID #35, 43); A.R. (12/16/14 Email) (Page ID #213–15). And Humphrey even testified that other POVs shared DeCommer's concerns, such that he had to schedule a series of meetings with them. A.R. (Hr'g Tr. at 115–16) (Page ID #121–22). Even if DeCommer was motivated in part by his own interests, there is substantial evidence to support the NLRB's conclusion that DeCommer raised truly group complaints and was therefore engaged in concerted activity.

Second, AEI argues that the complaint did not allege that DeCommer was fired for discussing the compensation change with his coworkers. AEI Br. at 29. The Sixth Circuit has made clear that "[i]t is well established that the Board may find a violation not alleged in the complaint if the matter is related to other violations alleged in the complaint, is fully and fairly litigated, and no prejudice to the respondent has been alleged or established." *NLRB v. Consol. Biscuit Co.*, 301 F. App'x 411, 423 (6th Cir. 2008) (alteration in original) (quoting *Action Auto Stores*, 298 N.L.R.B. 875, 876 n.2 (1990)). The complaint alleges that DeCommer was fired for "concertedly complain[ing] to Respondent regarding the wages, hours, and working conditions of Respondent's employees, by discussing Respondent's policies for employees who utilize privately owned vehicles on Respondent's behalf, and regarding the compensation of certain employees." A.R. (Compl. at 2) (Page ID #153). The acts of discussing compensation and concertedly complaining about compensation are closely related, even arguably inseparable. AEI does not deny this. AEI also does not dispute that whether DeCommer discussed the compensation changes with other employees was fully litigated, and it does not identify any prejudice it suffered as a result of the alleged lack of clarity in the complaint. To the extent that

there is any discrepancy between the complaint and the violation found by the NLRB based on the ALJ's reasoning, the "well established" criteria are met. *Consol. Biscuit Co.*, 301 F. App'x at 423.

AEI's third argument is that substantial evidence does not support the NLRB's finding that AEI fired DeCommer for engaging in protected, concerted activity. AEI Br. at 30. The *Wright Line* test applies to allegations of unlawful termination for engaging in protected, concerted activity. *See NLRB v. Transp. Mgmt. Corp.*, 462 U.S. 393, 397, 404 (1983) (adopting the test announced in *Wright Line*, 251 N.L.R.B. 1083 (1980)). Under the *Wright Line* test, the NLRB General Counsel first has the burden to prove that "protected conduct was a substantial or motivating factor in the" employee's discharge. *Transp. Mgmt. Corp.*, 462 U.S. at 401. If the General Counsel meets this burden, the employer can present the affirmative defense that the employee would have been fired regardless of the protected conduct. *Id.* In reviewing the NLRB's application of the *Wright Line* test, we apply "[t]he deferential substantial evidence standard" to findings of fact and applications of law to the facts. *Local 334*, 481 F.3d at 879 (internal quotation marks omitted). This standard asks whether there is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quotation marks omitted).

The ALJ concluded, and the NLRB panel affirmed, that the General Counsel met his burden of establishing a prima facie case that AEI discharged DeCommer for engaging in protected, concerted activity; the ALJ also concluded, and the NLRB also affirmed, that AEI's alternative explanation for firing DeCommer was pretextual and that AEI would not have fired DeCommer regardless of the protected conduct. *See* A.R. (Decision & Order at 1 n.2, 9–10) (Page ID #347, 355–56). In support of these conclusions, the ALJ made the factual determinations that DeCommer exercised his NLRA rights by complaining to management and coworkers about the proposed changes to POV compensation and that management knew he engaged in protected activities. *Id.* at 10 (Page ID #356). The ALJ applied the law to those facts to determine that there was strong circumstantial evidence that DeCommer was fired for engaging in protected activities. *Id.* Addressing AEI's affirmative defense that DeCommer would have been fired anyway, the ALJ determined that AEI's explanation that it fired

DeCommer because of his slipping performance in smart home sales was pretextual. *Id.* The ALJ noted that when other employees performed deficiently, they were coached and not immediately terminated. *Id.* The ALJ also noted that DeCommer still met the company's goals even when his performance slipped, and that there was no evidence that AEI was unsatisfied with DeCommer's performance immediately prior to his termination. *Id.*

This evidence is "adequate to support" the ALJ's factual findings and conclusion that DeCommer was fired for engaging in protected, concerted activity. *Local 334*, 481 F.3d at 879. Therefore we deny AEI's request for relief from the NLRB's findings and conclusions because they are supported by substantial evidence.

## IV. SUMMARY ENFORCEMENT OF THE CONCLUSION THAT BARRING EMPLOYEES FROM DISCUSSING COMPENSATION VIOLATES THE NLRA

Finally, the NLRB is entitled to summary enforcement of its order concluding that AEI violated the NLRA by including in its handbook a rule forbidding employees from discussing compensation-related information. The NLRB determined that AEI's rule "prohibit[ing] an employee from making an unauthorized disclosure of business secrets or confidential business or customer information, including any compensation or employee salary information" is "facially invalid." A.R. (Decision & Order at 8) (Page ID #354); *Alt. Entm't, Inc.*, 2016 WL 737010 at *5 (internal quotation marks omitted). "[A]n employer unlawfully intrudes into its employees' Section 7 rights when it prohibits employees, without justification, from discussing among themselves their wages and other terms and conditions of employment." *Id.*

According to its brief, "AEI has not excepted to the finding regarding the confidentiality policy." AEI Br. at 19 n.1. When a party "does not address or take issue with the Board's conclusions" it "has effectively admitted the truth of those findings." *NLRB v. Gen. Fabrications Corp.*, 222 F.3d 218, 231–32 (6th Cir. 2000). Therefore, "the Board's Order is entitled to summary affirmance." *Id.* at 232. We summarily enforce the portion of the NLRB's order concluding that AEI violated the NLRA by forbidding employees from discussing compensation-related information.

## V.  CONCLUSION

For the reasons stated above, we **GRANT** the NLRB's application to enforce its order.

---

**CONCURRING IN PART AND DISSENTING IN PART**

---

SUTTON, Circuit Judge, concurring in part and dissenting in part. When James DeCommer began working for Alternative Entertainment, the two entered into an employment contract in which they agreed to arbitrate any employment disputes on an individual, as opposed to a class-wide or joint, basis. In reaching this agreement, the employer and employee contracted to do just what the Federal Arbitration Act allows, indeed favors: to use the streamlined efficiency, informality, and low costs of arbitration to resolve any disputes that might arise during the course of the employment relationship. Case after case from the United States Supreme Court confirms the point, all while rejecting similar efforts to sidestep the imperatives of the Federal Arbitration Act, all while rejecting similar forms of hostility toward arbitration. *See Am. Express Co. v. Italian Colors Rest.*, 133 S. Ct. 2304 (2013); *CompuCredit Corp. v. Greenwood*, 132 S. Ct. 665 (2012); *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011); *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105 (2001); *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20 (1991).

Today's manifestation of hostility toward arbitration comes, oddly enough, from the National Labor Relations Board. That should surprise readers because the first Supreme Court decisions defending arbitration as a method of dispute resolution involved labor disputes in which unions used arbitration over the objections of industrial employers. *See United Steelworkers v. Enter. Wheel & Car Corp.*, 363 U.S. 593 (1960); *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574 (1960); *United Steelworkers v. American Mfg. Co.*, 363 U.S. 564 (1960). And this court has many decisions not only supporting arbitration but also making arbitration decisions nearly impervious to review in court, all to the end of respecting the labor-relations policies underlying the National Labor Relations Act, all at the urging of the Board. *See, e.g., Mich. Family Res., Inc. v. Serv. Emps. Int'l Union Local 517M*, 475 F.3d 746, 753–54 (6th Cir. 2007) (en banc); *Titan Tire Corp. v. United Steelworkers*, 656 F.3d 368, 373–75 (6th Cir. 2011).

In refusing to adhere to the mandate of the Federal Arbitration Act and in refusing to enforce today's arbitration agreement, the court invokes Section 7 of the National Labor Relations Act, which gives employees the "right . . . to engage in other concerted activities for the purpose of . . . mutual aid or protection." 29 U.S.C. § 157. The right to engage in "other concerted activities," says the court, encompasses the right to engage in class actions and thus makes this arbitration agreement unenforceable and a violation of the NLRA to boot.

With respect, the theory errs at each turn. The FAA by its words applies to this agreement. A bevy of Supreme Court decisions confirms that it applies in this setting, including most pertinently in the context of class-action waivers. The NLRA does not make a general exception to the FAA for arbitration agreements or class-action waivers. And the NLRA does not specifically nullify such arbitration agreements through Section 7. As a matter of text and context, the right to engage in "other concerted activities" is the right of workers to support each other in collective bargaining and even in litigation, but not the right to file a representative class action or to invoke any other collective procedure. For these reasons and those elaborated below, I respectfully dissent.

Consider first the law that today's decision nullifies. The Federal Arbitration Act says that arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. It does not contain an exception for labor disputes or for the NLRA. Consistent with the straightforward policy reflected in the language of the FAA, courts (and administrative agencies) must "rigorously enforce arbitration agreements according to their terms." *Italian Colors*, 133 S. Ct. at 2309 (quotation omitted).

Consider next how the Supreme Court has applied this language and policy. In recent years, the Court has not hesitated to apply the FAA to enforce class-action waivers. *See Concepcion*, 563 U.S. at 344. Any other approach, the Court reasoned, "sacrifices the principal advantage" of arbitration—its procedural informality—and thus "creates a scheme inconsistent with the FAA." *Id.* at 344, 348. That is today's case: *Concepcion* respects precisely what today's decision slights.

Nor has the Court hesitated to enforce the FAA in the context of federal workplace-rights statutes. The decisions uniformly permit workers to waive their rights to pursue lawsuits in federal court or use class-action and other collective-action procedures in pursuing relief. The Court has upheld application of the FAA in every case it has considered involving a statutory right "that [did] not explicitly preclude arbitration." *D.R. Horton, Inc. v. NLRB*, 737 F.3d 344, 357 n.8 (5th Cir. 2013). That includes federal statutes, which must contain a "contrary congressional command" to override the FAA's mandate, *CompuCredit*, 132 S. Ct. at 669, and more particularly that includes federal statutes that apply exclusively in the workplace. In *Gilmer*, a plaintiff argued that arbitration was inappropriate for Age Discrimination in Employment Act claims because the arbitrator might not permit collective procedures. 500 U.S. at 32. Notably, the Court "had no qualms in enforcing a class waiver in an arbitration agreement even though . . . the Age Discrimination in Employment Act [] expressly permitted collective actions." *Italian Colors*, 133 S. Ct. at 2311 (discussing *Gilmer*). Every circuit to consider the question has concluded that an employee may waive the right to bring a collective action under the Fair Labor Standards Act, which includes the same collective-action provision as the Age Discrimination in Employment Act. *See Walthour v. Chipio Windshield Repair, LLC*, 745 F.3d 1326, 1336 (11th Cir. 2014); *Sutherland v. Ernst & Young LLP*, 726 F.3d 290, 296–97 & n.6 (2d Cir. 2013) (per curiam); *Owen v. Bristol Care*, 702 F.3d 1050, 1052–53 (8th Cir. 2013); *Carter v. Countrywide Credit Indus.*, 362 F.3d 294, 298 (5th Cir. 2004); *Adkins v. Labor Ready, Inc.*, 303 F.3d 496, 503 (4th Cir. 2002). The Second Circuit has enforced class-action waivers for Title VII claims, even where the plaintiff sought to bring a pattern-or-practice claim, which non-government plaintiffs in that circuit may bring only in class actions. *Parisi v. Goldman, Sachs & Co.*, 710 F.3d 483, 488 (2d Cir. 2013).

Those are the relatively hard cases. Most other workplace-rights statutes are silent on collective action, and plaintiffs must rely on Rule 23 to bring a class action or Rule 20 to join their claims. The Court has made clear that these rules of procedure create "procedural right[s] only" (naturally enough), which makes them "ancillary to the litigation of substantive claims," and thus makes them subject to waiver. *Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 332 (1980).

Consider next the language of the National Labor Relations Act. Start with the easy point. The NLRA, all agree, does not create an express exemption from the FAA or expressly prohibit class-action waivers by name, not when the NLRA was first enacted in 1935 and not through any subsequent amendments to it. In view of the Supreme Court's FAA decisions over the last several years, that should end this case.

Nor does the NLRA indirectly create an exception to the FAA. By giving employees the "right . . . to engage in other concerted activities for the purpose of . . . mutual aid or protection," 29 U.S.C. § 157, and by prohibiting employers from interfering with that right, *id.* § 158(a)(1), the NRLA does not cancel out the FAA. It's not plausible that Congress was *trying* to create this exception to the FAA. Civil Rule 23 did not even exist then. Not until 1966 did the Federal Rules of Civil Procedure provide for class actions. That leaves the possibility that this language of the NLRA, no matter the explanation for enacting it, no matter the laws then in existence, nullifies the FAA anyway and serves to protect an employee's right to file a class action. I don't think so.

We may read Section 7 to repeal the FAA only if the conflict between the two statutes is "irreconcilable." *Branch v. Smith*, 538 U.S. 254, 273 (2003). But the Board's interpretation of Section 7 is not the only possible one; it's not even the best one. The engine of the Board's theory has two pistons. The first is that the right to engage in "other concerted activities" includes the right to bring a class action or other group lawsuit. The second is that the Board has authority to interpret the NRLA, and accordingly its interpretation of "concerted activities" must receive *Chevron* deference from the courts. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council*, 467 U.S. 837, 842–43 (1984). Both ideas misfire—first because the language of Section 7 is not sufficiently elastic to cover this theory and second because *Chevron* does not give the Board authority to nullify a statute (the FAA) over which it does not have interpretive authority.

The words "concerted activity" cover "mutually contrived or agreed on" activities. *Merriam-Webster's Collegiate Dictionary* (11th ed. 2003); *see also American Heritage Dictionary* (5th ed. 2011) ("[p]lanned or accomplished together"); *Webster's New International Dictionary* 553 (2d ed. 1942) ("[m]utually contrived or planned; agreed on"). As the Supreme Court has put it, Section 7 "embraces the activities of employees who have joined together in

order to achieve common goals." *NLRB v. City Disposal Sys. Inc.*, 465 U.S. 822, 830 (1984). Under that definition, all can agree that when a group of employees brings a lawsuit to achieve more favorable terms of employment, they are engaged in "concerted activity" for mutual aid or protection. *Eastex, Inc. v. NLRB*, 437 U.S. 556, 565–66 & n.15 (1978); *Brady v. Nat'l Football League*, 644 F.3d 661, 673 (8th Cir. 2011).

The key question, which the Board and the majority do not confront, is what makes such a lawsuit "concerted." The Board assumes that, when a court or arbitrator consolidates employees' claims through a class action or joinder, the employees litigate concertedly. But the "concertedness" of litigation does not turn on the particular procedural form that litigation takes. An activity is "concerted" as long as workers mutually plan and support it. Whether a group of employees brings a class action, joint claims, separate claims, or whether the group supports a single-plaintiff suit, their legal action is protected if they are substantively cooperating in the litigation campaign—say by pooling money, coordinating the timing of their claims, or sharing attorneys and legal strategy. These are the sort of collaborative activities—which employees can engage in of their own accord and not at the leave of a judge—that Section 7 protects.

The first canon of construction—that words are "known by the company they keep"— confirms this interpretation. *Logan v. United States*, 552 U.S. 23, 31 (2007). Consider the "concerted activities" language in context. Section 7 guarantees workers "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157. Employees engage in each of the listed activities—organization, unionization, collective bargaining, electing representatives—on their own collective initiative. The same can be said about a group of employees filing a lawsuit or set of lawsuits against their employer. All of these self-directed, collaborative activities are part of the "freedom of association [and] self-organization" that Section 7 protects. *Id.* § 151. But class litigation is not something that employees just *do*. The use of collective procedures is limited by statute, by the rules of the forum, and, yes, by waiver. Section 7 prevents employers from interfering with employees' attempts to assert their own

interests through collective action; it does not create an affirmative right to use or pursue courtroom procedures that the law carefully limits.

The related canon of *ejusdem generis*—the principle that when a general term follows a list of specific terms, the general term should be understood to refer to subjects akin to the specific ones—also requires us to interpret "other concerted activities" more narrowly than the Board. *Circuit City*, 532 U.S. at 114–15. We cannot leap from the independent, real-world activities that Section 7 enumerates to the highly regulated, courtroom-bound "activities" of class and joint litigation.

The Board's interpretation of "concerted activities" does not even work on its own terms. Section 7 cannot do what the Board wants—guarantee a right to engage in the activity of a class action—because independent rules and statutes limit the use of those procedures. Employees cannot "mutually contrive or agree" to litigate as a class, or even to join their claims. A judge or arbitrator makes the decision to group claims together based on the procedural rules of the forum. A federal court may certify a class under Rule 23 only if it meets the numerosity and commonality requirements and only if the representative plaintiffs are typical of the class and will adequately protect its interests. In the more specific setting of the Fair Labor Standards Act or the Age Discrimination in Employment Act, a court may certify a class only if the plaintiffs who opt in are "similarly situated." *Comer v. Wal-Mart Stores, Inc.*, 454 F.3d 544, 547 (6th Cir. 2006). And a court may join claims under Rule 20 only if they arise out of the same transaction or occurrence. All of these procedural requirements must be met before plaintiffs can proceed collectively, no matter what Section 7 says. It would make little sense for the "concertedness" of a litigation campaign to turn on judicial decisions over which workers have no control. Employees participating in a litigation campaign are still "joined together in order to achieve common goals" even if their claims are kept separate. *City Disposal*, 465 U.S. at 830.

Even if procedure were relevant to "concertedness," there is nothing inherently "concerted" about the class action. The purpose of Rule 23 is to enable action on behalf of absent class members, who will be bound by the result unless they opt out of the class. A single plaintiff can litigate a class action to completion without any intervention by or material support from any other class members. This sort of representative action is not necessarily concerted. If

anything, it risks undermining genuine group action by permitting the representative plaintiff to stand in for all nonparticipating parties.

In addition to failing to come to grips with the relevant language and above all the context in which it appears, the Board's theory creates a bizarre alchemy. It would mean that Section 7 guarantees an employee the right to pursue a collective action—under, say, the Age Discrimination in Employment Act—that the ADEA itself permits to be waived. *Gilmer*, 500 U.S. at 32. The same would be true under the FLSA and Title VII. *See Walthour*, 745 F.3d at 1336; *Parisi*, 710 F.3d at 488. Statutory interpretation prioritizes the specific over the general. If Congress wanted to create unwaivable rights to pursue class actions or other collective lawsuits, it would place that right in the workplace-rights statutes themselves, not in the NLRA in 1935. The Board's theory is worse than assuming Congress would place elephants in mouseholes. *See Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 468 (2001). It assumes that Congress forgot how to write statutes.

The Board seeks to sidestep these problems by saying that Section 7 "does not create a right to class certification or the equivalent, but . . . it does create a right to *pursue* joint, class, or collective claims if and as available, without the interference of an employer-imposed restraint." *Murphy Oil USA, Inc.*, 361 NLRB No. 72, at *2 (Oct. 28, 2014). But the *pursuit* of collective litigation is a different activity from collective litigation itself. And if the concerted activity protected by Section 7 is the *pursuit* of collective litigation, then the Board's interpretation accomplishes nothing. Waivers do not inhibit the right to pursue a goal; they inhibit the ability to obtain it. In this case, employees who signed the class-action waiver can band together to lobby their employer to remove the waiver from the contract, or they can ask a court to declare the waiver invalid on some generally applicable ground. The employees' pursuit of collective procedures may or may not bear fruit, but the pursuit will nonetheless be protected from retaliation.

If the right to pursue a certain outcome overcame an otherwise enforceable waiver, the Board's theory would prove too much. Employees can collectively pursue any number of goals—take annual raises or more vacation days—that they might initially have waived in their employment contracts. Consider the right to a jury trial, another procedural right that employees

waive by entering an arbitration agreement. Absent an arbitration agreement, a group of employees would be entitled to a jury trial after demanding one pursuant to Rule 38, in the same way that a group of employees might be entitled to class certification after filing a motion under Rule 23. But the fact that employees could collectively pursue and obtain a jury trial if they had not signed the arbitration agreement cannot render the agreement ineffective. Otherwise, Section 7 would invalidate all arbitration agreements. Similarly, the fact that employees could collectively pursue and (perhaps) obtain a class action by filing a certification motion cannot invalidate the class-action waiver. Again, Section 7 still gives employees the right to pursue a jury trial or a collective procedure by submitting a jury demand or certification motion and contesting the agreement's validity. But the right to collectively pursue a certain goal cannot require courts to disregard otherwise valid waivers.

*Chevron* does not fix these problems. In the first place, the Board's theory does not get out of the step-one gate. *Chevron* deference comes at the end, not the beginning, of the interpretive process. *See Lechmere, Inc. v. NLRB*, 502 U.S. 527, 536–37 (1992). For the reasons just given, the Board's interpretation of Section 7 cannot be squared with the relevant language and its context.

In the second place, the Board "has not been commissioned to effectuate the policies of the Labor Relations Act so single-mindedly that it may wholly ignore other and equally important Congressional objectives." *S. S.S. Co. v. NLRB*, 316 U.S. 31, 47 (1942). By interpreting Section 7 to invalidate class-action waivers, the Board has produced a conflict with the Federal Arbitration Act, which instructs courts to "rigorously enforce arbitration agreements according to their terms." *Italian Colors*, 133 S. Ct. at 2309 (quotation omitted).

The conflict between the Board's *D.R. Horton* rule and the FAA means that the presumption against implied repeals sets in, and *Chevron* leaves the stage. *Chevron* deference comes into play only when a court finds a statute to be ambiguous after "employing traditional tools of statutory construction." *Chevron*, 467 U.S. at 843 n.9. The presumption against implied repeals tells us to interpret ambiguous statutes to preserve earlier-enacted laws, and thus resolves any ambiguity in Section 7. In this setting, "there is, for *Chevron* purposes, no ambiguity in such a statute for an agency to resolve." *I.N.S. v. St. Cyr*, 533 U.S. 289, 320 n.45 (2001).

The institutional rationale for *Chevron* deference is also missing in implied-repeal cases. When assessing whether "two statutes are capable of co-existence, it is the duty of the courts . . . to regard each as effective." *Morton v. Mancari*, 417 U.S. 535, 551 (1974). Because this determination requires the courts to interpret both statutes, there is no room to defer to the Board's construction of the National Labor Relations Act, particularly a construction that repeals a statute outside the Board's expertise and interpretive authority. *See Nigg v. U.S. Postal Serv.*, 555 F.3d 781, 786 (9th Cir. 2009); *In re Stock Exchs. Option Trading Antitrust Litig.*, 317 F.3d 134, 149 (2d Cir. 2003); *Passamaquoddy Tribe v. Maine*, 75 F.3d 784, 794 (1st Cir. 1996); *see also Gordon v. N.Y. Stock Exch., Inc.*, 422 U.S. 659, 686 (1975) ("[T]he determination of whether implied repeal of the antitrust laws is necessary to make the Exchange Act provisions work is a matter for the courts.").

Trying to keep a grip on *Chevron* deference, the Board and the majority maintain that any conflict between the *D.R. Horton* rule and the FAA is illusory. But the Board's interpretation of Section 7 runs headlong into *Concepcion*. The inescapable conclusion is that, like the California Supreme Court's prohibition on class waivers in consumer contracts, the Board's prohibition on class waivers in employment contracts "creates a scheme inconsistent with the FAA." *Concepcion*, 563 U.S. at 344. It is particularly noteworthy in this respect that the California Supreme Court, in a thoughtful opinion by Justice Liu, recognizes that *Concepcion* forecloses the *D.R. Horton* rule. *Iskanian v. CLS Transp. L.A., LLC*, 327 P.3d 129, 141 (Cal. 2014).

The Board nonetheless claims that we can avoid the conflict through the FAA's saving clause, which provides that courts may invalidate arbitration agreements "upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Any employment contract is revocable on the grounds that it is illegal and, says the Board, Section 7 of the NLRA makes the class-action waiver illegal.

That is a repackaging of arguments *Concepcion* already rejected. The Court held that the FAA preempted the California Supreme Court's holding that class-action waivers in consumer contracts of adhesion were unconscionable. The plaintiffs argued that the state-court rule fell within the saving clause because unconscionability is a generally applicable contract doctrine. Substitute "illegality" for "unconscionability," and you have the Board's argument in today's

case. That did not work there. It should not work here. The Court did not buy the contention that the California Supreme Court's decision was neutral with respect to arbitration. Unconscionability, like illegality, may be a generally applicable objection to any contract, but the California Supreme Court applied the doctrine in a way that interfered with the "fundamental attributes" of arbitration. *Concepcion*, 563 U.S. at 344.

Just like the Board, the *Concepcion* plaintiffs also argued that the state-court rule did not single out arbitration agreements because it also applied to waivers of class litigation. *Id.* at 341. But though the rule may have applied equally to litigation, there was no mistaking that it would have a "disproportionate impact on arbitration agreements." *Id.* at 342; *see Kindred Nursing Ctrs. Ltd. P'ship v. Clark*, No. 16-32, 581 U.S. __, slip op. at 5 (2017). The Court drove home the point by imagining other rules that would be formally neutral between arbitration and litigation but would clearly burden the former, including a thinly veiled jury requirement that made unconcscionable any agreement that failed to provide for ultimate disposition by "a panel of twelve lay arbitrators." *Concepcion*, 563 U.S. at 342. These rules, like the California Supreme Court's ban on class waivers, would stand as "obstacle[s] to the accomplishment of the FAA's objectives," and therefore could not be preserved by the saving clause. *Id.* at 343. Accordingly, the Court found that the California Supreme Court's ban on class waivers was preempted, despite its formal neutrality with respect to arbitration.

The Board and the majority correctly identify one difference between *Concepcion* and this case: The Board's rule derives from a federal statute rather than state common law. But that hurts the Board's position. Saving clauses save state laws from preemption, *see, e.g.*, *UNUM Life Ins. Co. v. Ward*, 526 U.S. 358, 363 (1999); they don't save other federal statutes enacted by the same sovereign. Federal statutes do not need to be "saved" by a coequal statute in order to have effect. *See Morris v. Ernst & Young, LLP*, 834 F.3d 975, 991–92 (9th Cir. 2016), (Ikuta, J., dissenting), *cert. granted*, 137 S. Ct. 809 (2017).

No matter, the Board persists. Section 7 creates substantive rights, and the Federal Arbitration Act does not require courts to enforce arbitration agreements in which parties "forgo the substantive rights afforded by [a] statute." *Gilmer*, 500 U.S. at 26. But this argument asks a question; it does not answer the question. Sure, the Board may be correct that, *if* the right to

pursue class-action procedures is guaranteed by Section 7, then the right is substantive and cannot be waived. But whether Section 7 guarantees that right is precisely the dispute. Because the *D.R. Horton* rule conflicts with the FAA, the *D.R. Horton* rule must yield. And because the Board has no interpretive authority over the FAA, it can't use *Chevron* to inoculate its decision from fresh review. We ask not whether the Board's interpretation is reasonable, but whether it is so clearly correct that no alternative is available. As we have just seen, the Board's interpretation of Section 7 is not even the best one, much less the only possible one.

As for the rest of today's decision, I agree with the majority that substantial evidence supports the National Labor Relations Board's finding that DeCommer's termination was unlawful.

For these reasons, I respectfully dissent.